No. 26,969.

THE STATE OF KANSAS, *Plaintiff*, v. ROY BIEBER, *Defendant.*

SYLLABUS BY THE COURT.

ATTORNEY AND CLIENT — *Disbarment of Attorney — Misdemeanor Involving Moral Turpitude—Possession of Intoxicating Liquor.* It is a misdemeanor involving moral turpitude for an attorney at law to have unlawful possession of intoxicating liquor; and upon a certification of a judgment of a district court showing his plea of guilty to such misdemeanor and the sentence rendered thereon, the supreme court must enter an order disbarring him from the practice of law, in conformity with R. S. 7-110.

Original proceedings in disbarment. Opinion filed July 10, 1926. Order of disbarment entered.

*G. J. Sharp,* of Howard, *A. M. Keene,* of Fort Scott, and *James A. Troutman,* of Topeka, for the plaintiff.

*Robert C. Foulston, W. E. Holmes, D. W. Eaton, George Siefkin* and *Sidney L. Foulston,* all of Wichita, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: This is a special proceeding to determine whether an attorney who pleaded guilty to the misdemeanor of having unlawful possession of intoxicating liquor should be disbarred from the practice of law as prescribed by R. S. 7-110.

Section 1 of chapter 64 of the Session Laws of 1913 (R. S. 7-110 *et seq.*), which is the statute relating to proceedings in disbarment and reinstatement of attorneys, reads thus:

"That in the case of the conviction of an attorney at law, who has been admitted to the bar of this state, of a felony or of a misdemeanor involving moral turpitude, the clerk of the court in which such conviction is had must within thirty days thereafter, transmit to the supreme court a certified copy of the record of conviction, and the supreme court upon receipt of such record, must enter an order disbarring such attorney. Upon reversal of such conviction, or pardon by the governor, the supreme court shall have the power to vacate such order of disbarment."

In belated compliance with this statute, on February 10, 1926, the clerk of the district court of Elk county transmitted to this court a certified copy of a judgment entered against Roy Bieber, an attorney at law of Elk county, which in part reads:

Attorney and Client, 6 C. J. p. 586 n. 23; L. R. A. 1918A, 1192.

State v. Bieber.

"Now on this 5th day of January, 1925, . . . this cause comes regularly on for trial, plaintiff being present . . .

"Thereupon, defendant is arraigned and waived trial by jury, and pleads guilty to the crime of unlawful possession of intoxicating liquor. . . .

"Thereupon, . . . the said defendant, Roy Bieber, being inquired of by the court if he had any legal cause to show why judgment should not be pronounced against him according to law and failing to show such cause,

"It is therefore by the court considered, ordered and adjudged that the said defendant, Roy Bieber, pay a fine in the sum of one hundred and no/100 ($100) dollars, and is sentenced to the jail of Elk county, Kansas, for a term of six months, and to stay committed to such jail until said fine and costs are paid.

"Whereupon, this matter still comes on for further hearing on the application for parole of said defendant, Roy Bieber, and it is further ordered and adjudged that upon the payment of said fine and costs as aforesaid, the said defendant is paroled to Tom Matthis, city marshal of the city of Moline, Elk county, Kansas, and J. F. Deal, attorney of Grenola, Elk county, Kansas, the condition of said parole being that said defendant shall refrain from any violation of the prohibitory law of the state of Kansas and from any disturbances of the peace and quiet of said city of Moline. Further ordered that said patrons, Tom Matthis and J. F. Deal, shall at once report to this court any infringement of the terms of this parole."

On receipt of a certified copy of this judgment, this court issued an order to defendant to show cause why an entry of disbarment should not be made against him.

He now answers, pleading that the infraction of law to which he pleaded guilty is not a conviction "of a felony or of a misdemeanor involving moral turpitude" under the statute quoted above. He further answers:

"That if it be the opinion of this court that the illegal possession of intoxicants may or may not, according to the attendant circumstances, become or constitute a misdemeanor involving moral turpitude, then this answering defendant requires that this court afford to this defendant the opportunity to offer competent evidence to show that there are no attendant circumstances which warrant a conclusion that there is, or was, any moral turpitude involved in said connection.

"If permitted or required to do so, this defendant alleges the facts to be:

"(a) That on December 13, 1924, the sheriff of Elk county, Kansas, together with some deputies, came to the home of this defendant and with the permission and consent of the defendant, searched his home.

"(b) That on the back porch of defendant's home a jug containing a small quantity of intoxicants was found and seized by said officers. . . .

"(d) The defendant will otherwise show that he is, except as herein stated, a law-abiding citizen of Moline, Elk county, Kansas; that he has heretofore and now bears a good name and standing in said community."

Defendant also directs attention to the fact that there was no compliance with the statute "within thirty days" after judgment upon his plea of guilty; and—

"That no action was taken herein for more than one year after the date of the completion of the final record and that at so late a date it was certified to this court in violation of said statute above referred to and for the purpose of unjustly and illegally harrassing this defendant and to gratify personal animosity."

A majority of this court declines to permit this proceeding to descend into the realm of issuable facts, and holds that there is nothing to consider except the legal question whether the offense of having unlawful possession of intoxicating liquor is a misdemeanor involving moral turpitude.

In view of the fact that an attorney at law holds a position of a quasi-public character, as an officer of the court and enjoying important privileges not accorded to people in general, it is not unreasonable to exact a higher standard of private conduct from him than that expected from the rank and file of our citizenry. The whole drift of Kansas legislation for over half a century has been to curtail, to restrict, and eventually to eliminate by complete prohibition, the admitted evils of the liquor traffic and all its incidents. The attitude of our people on this matter is well reflected in our successive statutes from the "Act to restrain dram shops and taverns," enacted by the territorial legislature of 1859 (Comp. Laws 1862, ch. 84), to the present time, including the prohibitory amendment to the constitution of 1880, the Murray act of 1881 (Laws 1881, ch. 128) and its many strengthening amendments, also the Mahin act of 1913 requiring importations of liquor by common carriers to be reported to the county clerk (Laws 1913, ch. 248), and culminating in the "bone-dry" law of 1917 (ch. 215), which made the mere possession of liquors by any person except a druggist a misdemeanor as a first offense (Laws 1917, ch. 215) and a felony for its repetition. (R. S. 21-2146; *State v. Berry,* 103 Kan. 891, 176 Pac. 649.)

In *State v. Macek,* 104 Kan. 742, 180 Pac. 985, the progressive quickening of the American people's moral attitude towards intoxicating liquor and their recognition of its antisocial consequences was noted. This court said:

"We come, then, to the last and only serious question in this lawsuit—the constitutionality of the 'bone-dry' law. Appellant says that it is unconstitutional and void, and cites many a respectable authority and precedent from

State v. Bieber.

Blackstone's time down to yesterday to that effect. But they all stop yesterday! The times change. Men change, and their opinions change; their notions of right and wrong change. The United States, its government and people, have come a long, long way since the Washingtonian society was organized in 1840 to combat intemperance. A whole generation of Americans has been born and educated, and has grown to maturity and taken its dominant place in the electorate and in official life, since instruction in the evil effects of intoxicants upon the human system became compulsory in our public schools. (Laws 1885, ch. 169; Gen. Stat. 1915, § 9034.) That is the leaven which has leavened the whole lump. 'Learn young, learn fair,' is an old adage whose efficacy was never better proved than in the practical annihilation of the liquor traffic by the unnoticed, but persistent, work of the public schools for the last thirty years. While we of an earlier generation continued to argue the pros and cons of the liquor traffic, and the wisdom, or folly, or impossibility, of suppressing the sale and use of intoxicants, a generation arrived which will have none of it; that generation has said so as clearly and emphatically as the American people ever voiced their determination on any subject since 1776. (XVIII amendment to U. S. Const.) And because of the ease with which the law prohibiting sales, etc., of liquor may be violated, and the difficulty of procuring evidence of such violation, the legislature of 1917 (Laws 1917, ch. 215) decreed that the mere possession of intoxicants, or knowingly to permit them to be kept on one's premises, should be unlawful. Any legislature sincerely determined to suppress the sale of liquor and to suppress the keeping of tippling nuisances, would be strongly persuaded to go the final step of forbidding the mere possession of intoxicants; otherwise its laws forbidding liquor sales and the existence of drinking dens would be bound to be somewhat ineffective. The whole matter is one of public policy. And the public policy of a state must largely be shaped by legislation. No federal or state constitutional inhibition was violated in the enactment of the 'bone-dry' law, all of yesterday's juristic dissertations and precedents to the contrary notwithstanding." (p. 745.)

An attorney at law ought to be a help and not a hindrance in this forward-moving attitude towards the suppression of intoxicants. From the very nature of his profession, a lawyer is a man of consequence in the community. By law an attorney not only enjoys privileges not conferred on all men, but he gets his livelihood from organized society because it and its spokesman, the legislature, believe that he performs a useful function in the maintenance of the social order and in the administration of justice. This function he cannot perform if he himself is a law breaker.

Our present question is not controlled by abstract consideration of whether in the absence of statute the possession of intoxicating liquor would be immoral. That is not the proper test. The expressed sentiment of the people of the state and nation is that for

reasons involving moral grounds the use of liquor must be curbed, and to that end various acts in relation to it have been forbidden because to permit them would tend to frustrate the general purpose of constitutional prohibition. In Kansas one of these forbidden acts is the possession of liquor. He who disobeys the statute in this regard to that extent refuses to abide by the legislative declaration of public policy and in some degree lends himself to its defcat. In this aspect there is no difference in principle between the violation of the provision against the possession of liquor and those forbidding its manufacture or sale. None of them would necessarily be immoral in the absence of written law.

In *Crabb v. Board of Dental Examiners,* 118 Kan. 513, 235 Pac. 829, this court refused to interfere with the cancellation of the 1 cense of a dentist who had committed a breach of city ordinances in appearing in public places in an intoxicated condition and in driving his automobile in a public street while he was under the influence of liquor. The state board of dental examiners forfeited his l.c_nse on the ground that those delinquencies constituted "dishonorable conduct" under the statute. (R. S. 65-1407.)

This court said:

"We think that drunkenness in the circumstances stated involves dishonorable conduct, and that one who is drunk is unfit for the practice of dentistry. One in that condition has not the normal control of his physical and mental faculties. His judgment and fitness for professional work is not only impaired, but the charges to which the plaintiff has confessed constituted public offenses. (R. S. 21-2128, 21-2160.) The statute requires that any one applying for a license to practice dentistry must show that he is a person of good moral character, implying that only those having that qualification are entitled to practice dentistry. What constitutes good moral character, is not easy to determine or define, but upon general principles one who does that which is forbidden and penalized by the law of the land does not possess the character and fitness required by the statute. Whatever is forbidden by law must for the time being be considered as immoral. (*In re Spencer,* 22 Fed. Cas. 921; 4 Words and Phrases, 3124; 2 Words and Phrases, 2d series, 759.) In *Winslow v. Board of Dental Examiners,* 115 Kan. 450, 223 Pac. 308, one having a license practiced dentistry for a corporation under the name of the corporation. While the practice of the profession under a name other than his own is a specific ground for exclusion from the practice, it was held that the plaintiff's conduct in that respect was 'gravely reprehensible from the standpoint of morality.' Likewise it must be held that the admitted violations of law constitute dishonorable conduct within the meaning of the statute under consideration. The legislature appreciated the importance of morality and honor in those practicing dentistry because of the personal contact and close rela-

tions which necessarily exist between the dentist and the patient he treats and upon whom he operates, and manifestly intended to exclude from the profession those who fall below the standard of good moral character and honorable conduct.   .   .   .

"This close relation differs only in degree from that of a physician with his patients, and the good moral character and honorable conduct of the practitioner in either profession are essential qualifications.   (*Meffert v. Medical Board,* 66 Kan. 710, 72 Pac. 247.)"   (pp. 515, 516.)

In the case of *In re Sanford,* 117 Kan. 750, 232 Pac. 1053, where an attorney was convicted under a city ordinance of the offense of having unlawful possession of intoxicating liquor, this court was asked to enter an order of disbarment against him under the statute invoked in the present case.   And while the order was not made for obvious reasons stated in the opinion, it was there said:

"The theory of Kansas law is that those admitted to practice law and who continue in it shall be persons who obey the law and maintain a high standard of personal and professional integrity.   In a statute relating to the admission of attorneys to practice law, and to the disbarment and suspension of those who may be guilty of misconduct, there is a provision to the effect that upon the conviction of a lawyer of a crime involving moral turpitude and a record of it has been transmitted to this court, it shall enter an order of disbarment.   J. F. Sanford, a practicing attorney who had been duly admitted, was charged with having intoxicating liquor in his possession in violation of a city ordinance and was convicted in the police court of the city of Independence.   .   .   .   It may be noted that the conviction of itself operates as a disbarment, and has been characterized as a legislative rather than a judicial disbarment.   (*In re Anderson,* 101 Kan. 759, 168 Pac. 868.)"   (p. 750.)

In *Rudolph v. United States,* 6 Fed. (2d.) 487, it was held that there should be no judicial interference with the action of the local governing board of the District of Columbia in discontinuing the pension of a retired policeman who had committed a breach of the national prohibition act.   The information had charged him with the unlawful possession and transportation of intoxicating liquors. He pleaded guilty to the charge and was fined $200 and costs and his automobile was forfeited.   In part the court said:

"In the court below the case turned entirely on the question of whether or not a first-offense violation of the national prohibition law, of unlawfully having in possession and transporting intoxicating liquors, is a crime involving moral turpitude.   .   .   .

"We are not much concerned with the distinction sought to be made between crimes *malum in se* and those which are merely *malum prohibitum.* Many things which were not considered criminal in the past have, with the advancement of civilization, been declared such by statute; and the commis-

sion of the offense, if it involves the violation of a rule of public policy and morals, is such an act as may involve moral turpitude. . . . The prohibition movement, however . . . rests upon the theory that the use of intoxicating liquors as a beverage is detrimental to the public welfare and the public morals, and this advance step led to the adoption of the eighteenth amendment to the constitution of the United States and the national prohibition act, for its enforcement. . . .

". . . The traffic in intoxicating liquors has, by fundamental law, been denounced as inherently wrong, a social evil, condemned by every standard of private and public morals.

"There is no hard and fast rule as to what constitutes moral turpitude. It cannot be measured by the nature or character of the offense, unless, of course, it be an offense, inherently criminal, the very commission of which implies a base and depraved nature. The circumstances attendant upon the commission of the offense usually furnish the best guide. For example, an assault and battery may involve moral turpitude on the part of the assailant in one case and not in another. Intent, malice, knowledge of the gravity of the offense, and the provocation, are all elements to be considered. It may well be that an unsophisticated person could be caught in the act of transporting liquor, in violation of law, under circumstances which would not justify the court in holding that the act involved moral turpitude; but this rule can hardly be applied to a police officer of many years' experience, sworn to defend and uphold the law. . . .

"At the time plaintiff was convicted of a violation of the prohibition law he was still a member of the police force of the District of Columbia, upon the pay roll of the government, subject, under certain conditions, to be called into service. The act of 1916 provides that 'any retired member of the police department or fire department of the District of Columbia receiving relief under the provisions of this act may in time of flood, riot, conflagration, during extraordinary assemblages, or unusual emergencies, be called by the commissioners of said district into the service of the department from which he was retired.' . . .

"When plaintiff entered the public service as a policeman, he took a solemn oath to support and defend the constitution of the United States, and to bear true faith and allegiance to the same. It can hardly be said that a police officer, charged with the maintenance of the public peace, can be either defending the constitution, or bearing true faith and allegiance thereto, when he is engaged in an open violation of the law. As was said by the court in *Young v. Edmunson,* 103 Ore. 243, 204 Pac. 619, a disbarment proceeding: 'To support is to uphold; to maintain. No bootlegger is a supporter of the constitution and laws of the United States and of the state of Oregon. An attorney at law takes an oath to support the constitution and laws of the United States and of this state, and it is made his special duty so to do. He cannot consistently be both attorney at law and bootlegger at one and the same time.'" (pp. 487, 488, 489.)

The court holds that the offense perpetrated by Roy Bieber was

State v. Bieber.

a misdemeanor involving moral turpitude, and an order disbarring him from the practice of his profession as an attorney must be made in conformity with the statute.

It is so ordered.

BURCH, J., dissenting.

DAWSON, J. (dissenting): We have two wideawake, up-to-date law schools in this state, in which our oncoming generation of lawyers and judges is being taught—as all lawyers have been taught since the time of Cicero—that penal offenses are of two sorts, *malum in se* and *malum prohibitum,* which being translated into the Kansas language mean an evil in itself, and an evil forbidden. Misdeeds which are inherently wrong whether forbidden by law or not, like murder, rape, prostitution, burglary, theft, arson, breach of the peace, and the like, are examples of *malum in se,* and involve moral turpitude. Mere breaches of police regulations such as comprise the great and ever-swelling roll of statutes and city ordinances which forbid this, that, and the other thing, and which have no inherent relationship to abstract and generally accepted notions of right and wrong, are examples of the sort of crimes designated as *malum prohibitum.* The offense of Roy Bieber falls into the classification of misdeeds known as *malum prohibitum,* which involves no essential element of moral turpitude. The statute which requires this court to strike from the roll of attorneys the name of any lawyer who commits an offense involving moral turpitude was enacted in 1913, while the mere possession of a bottle of whisky was not a crime of any sort, *malum in se* or *malum prohibitum,* until 1917, when the "bone-dry" act was passed. As our chief justice said in *In re Sanford,* supra, the disbarment contemplated by this statute is legislative rather than judicial. Very well; let it remain so. We should not expand it by debatable interpretation. Being highly penal, it should be strictly construed. Certainly the act of 1913 providing for legislative disbarment did not contemplate disbarment for a breach of the "bone-dry" law which was not enacted until four years later. I would have no difficulty with this case if the defendant had been found guilty of some violation of the prohibitory law for personal gain, such as manufacturing for sale, or selling, or keeping a nuisance, or even if it were shown in ordinary disbarment proceedings—without his conviction or plea of guilty in a formal

prosecution under the crimes act—that he had been prostituting his talents as a lawyer to shield offenders against the prohibitory law; such professional misconduct might well be characterized as moral turpitude; but I cannot bring myself to the point of holding that by the isolated fact of having had a bottle of liquor on his kitchen shelf this man has been guilty of moral turpitude and should be deprived of his license to practice law. I therefore dissent.

HARVEY, J. (concurring specially): I concede that the mere possession of intoxicating liquor does not necessarily involve moral turpitude, and yet I think the order of disbarment should be entered in this case. Perhaps I am influenced in part by the misinformation furnished us at the time of defendant's admission to the bar—a matter to which I think we are not compelled to close our eyes. To me the oath of an attorney means something. It is an affirmative answer to the following:

"You do solemnly swear that you will support and bear true allegiance to the constitution of the United States and the constitution of the state of Kansas; that you will neither delay nor deny any man his right through malice, for lucre, or from any unworthy desire; that you will not knowingly foster or promote, or give your assent to, any fraudulent, groundless or unjust suit; that you will neither do, nor consent to the doing of, any falsehood in court; and that you will discharge your duties as an attorney and counselor of the supreme court and all inferior courts of the state of Kansas with fidelity both to the court and to your cause, and to the best of your knowledge and ability. So help you God."

I have never had much patience with the attitude of an attorney who evidently has studied law for the purpose of seeing the extent to which he himself can evade it, or advise his clients to do so. Considering this case and the history of defendant's admission to the bar, which is well known to this court, I am convinced that the oath of an attorney does not mean much to him. Until it does he would better occupy his time at some other vocation.