No. 30,712.

E. L. W. BROWN, *Appellant,* v. J. F. HASSIG et al., *Appellees.*

(15 P. 2d 401.)

Opinion filed November 5, 1932.

*L. C. Gabbert, Harry C. Castor, Robert Hasty, John Madden* and *John Madden, Jr.,* all of Wichita, for the appellant.

*Roland Boynton,* attorney-general, *W. C. Ralston* and *Everett E. Steerman,* assistant attorneys-general, for the appellees.

The opinion of the court was delivered by

SLOAN, J.: This was an action in mandamus to compel the board of medical registration and examination of the state of Kansas to reinstate the medical license of Dr. E. L. W. Brown. It is alleged that on and prior to December 10, 1929, the plaintiff was a regularly practicing physician and surgeon under a license regularly issued under the laws of the state of Kansas, and that he had been practicing his profession for twenty-seven years; that on December 10, 1929, the defendant found the plaintiff guilty of gross immorality and revoked his certificate authorizing the practice of medicine and

surgery; that the action of the defendant was without legal authority, *ultra vires*, arbitrary, oppressive and unsupported by the facts; that the evidence given in support of the complaint was false and fraudulent, and, if true, did not constitute gross immorality nor authorize the board to make the order revoking the certificate. In answer to the writ the defendant denied the allegations contained in the writ, except the allegations with reference to its official capacity and the making of the order revoking the certificate.

The trial court made findings of fact, the substance of which may be stated as follows: That about August 1, 1929, a complaint was filed with the defendant, verified by L. J. Griffin, charging the plaintiff with gross immorality. A trial was had on this complaint before the defendant. The evidence in support thereof was to the effect that the complainant was a married man living on a farm near Burns, Kan.; that during the early part of August, 1928, he went to plaintiff's office in El Dorado and consulted him concerning some spots on his scalp and face; that plaintiff advised him that such spots were caused by syphilis, and took a specimen of his blood and sent the same to the Lattimore Laboratories in El Dorado; that on August 14, 1928, plaintiff received a report of said test from the laboratory showing that the test was negative, and on that day plaintiff wrote a letter to Griffin advising him that the test showed positive and requested him to come down as soon as possible to get started on treatment. Shortly after the receipt of the letter Griffin returned to plaintiff's office and was told that the cost of the treatment would be about $150. He asked for the report on the test and was advised that the laboratory did not keep a record of its reports. A few days later Griffin again asked plaintiff for a copy of the report and he was handed a purported report showing the test was positive, which appeared to be signed by J. C. McCommas; that it later developed that the laboratory did keep a record of all tests made, and that the test in Griffin's case showed negative, meaning that he did not have syphilis. The doctor's explanation of this transaction was to the effect that he wrote the letter stating that the test was positive, and that some time after writing the letter Griffin came to his office and asked about the treatment and he told him it would cost in the neighborhood of $150; that Griffin asked for a copy of the report from the laboratory. He told him it had been mislaid and that he did not think the laboratory kept a record of the report.

Griffin returned a few days later and made a second request for a copy of the report. The plaintiff called at the laboratory and Mr. McCommas, the manager, was not there. There were blank forms for reports on a table and he took one of the blanks and wrote out a report showing the test positive and gave it to Griffin; that he afterwards found that he had made a mistake, and the report which he gave Griffin was the report of a test on another man. He handled the reports in his office by number and not by name, and through some mistake the exchange was made; that he did not know there had been a mistake until some time in November.

There was evidence to the effect that the plaintiff was a skilled physician and surgeon, and his reputation for truth and veracity, and as being honest, upright and skillful as a professional man, was good.

Evidence was introduced before the trial court to the effect that W. C. Ralston, an assistant attorney-general, represented the complainant in the hearing before the medical board and remained with the medical board during their deliberation after the case had been submitted.

The court found that the evidence before the board tended to sustain the charge made against the plaintiff in the complaint, and was sufficient to justify the finding of gross immorality, and denied the writ.

The plaintiff appeals and contends, first, that the evidence wholly failed to support the charge and finding by the board of gross immorality. Second, that the conduct of the board was oppressive and in fraud of appellant's rights.

The evidence before the medical board and the trial court was to the effect that the appellant made at least four misrepresentations of fact. First, that Griffin had syphilis. Second, that the Wassermann test made by the Lattimore laboratory showed positive. Third, that the laboratory did not keep a record of their blood tests. Fourth, he made a purported copy of the test showing the test positive. These representations were all shown to be false. From these facts the inference is drawn that the appellant acted wrongfully and fraudulently for the purpose of obtaining a fee for the treatment of Griffin. The inference thus drawn is not unreasonable, and, we think, fully warranted from all of the circumstances. The appellant admits that he made the representations, but claims that he made them relying on the records in his office, which he later discovered were

incorrect. In other words, he confesses the facts, but attempts to avoid the consequence by explanation. This presented a clear question of fact to be weighed and determined by a fact-finding tribunal. The medical board was created for this purpose, and it was its responsibility· to determine the facts, and, in the absence of fraud, corruption or oppression, its conclusion, if supported by evidence, is conclusive upon the courts. (*Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247.)

Did the facts found by the medical board constitute gross immorality? The statute provides that the board may revoke the certificate granted to any person guilty of a felony or gross immorality. (R. S. 65-1001.) The term gross immorality has no hard and fast definition. It is descriptive of a course of conduct. It is akin to moral turpitude. (*Rose v. Baxter*, 7 Ohio N. P. n. s. 132.) Habitual sale of intoxicating liquors contrary to law is gross immorality. (*Indiana Board, etc., v. Haag*, 184 Ind. 333.) The transportation of intoxicating liquors by automobile in violation of the federal statute involves moral turpitude. (*Rudolph v. United States, ex rel. Rock*, 6 F. (2d) 487; 40 A. L. R. 1042.) It is a misdemeanor involving moral turpitude for an attorney at law to have unlawful possession of intoxicating liquors. (*State v. Bieber*, 121 Kan. 536, 247 Pac. 875.) Reason and authority are quite convincing that a physician who falsely represents to his patient that he has syphilis for the purpose of obtaining a fee for the treatment of such disease is guilty of gross immorality.

It is next contended that the action of the medical board was oppressive and fraudulent. This contention is based on the fact that at the close of the evidence before the medical board Doctor Brown and his counsel were excluded from the room, but the assistant attorney-general, who appeared as counsel and prosecuted the case, remained in the room with the board during its deliberation. The theory back of the creation of administrative boards is that they are not bound by judicial rules. The members of such boards are not men trained in the art of jurisprudence, and to harness them with judicial rules would destroy the purpose for which they are created. In this particular case the board is constituted from the medical profession on the theory that they are best qualified to judge what is the proper conduct for one practicing such profession. They are not presumed to be familiar with legal terms and definitions. (*Meffert v. Medical Board*, supra; *Drainage District v. Rail-*

*way Co.,* 99 Kan. 188, 210, 211, 161 Pac. 937.) The attorney-general is the legal adviser of the medical board. It was proper for his assistant to advise the board on questions of law and procedure but under no circumstances should he participate in its deliberation on questions of fact. The trial court found that the assistant attorney-general "advised the board as to the legality of the steps in the proceeding, and as to what would constitute gross immorality as used in the statute, but that he did not advise or suggest in any way how the board should vote." This finding is supported by substantial evidence and is binding on this court. It exonerates the assistant attorney-general and defeats the claim of fraud and oppression. The practice of excluding the attorney representing the accused and permitting the representative of the complainant to remain with the board during its deliberation is not commendable. It is important in all proceedings where the responsibility rests with a tribunal to determine facts that they should be free from any influence or apparent influences from the parties concerned, or their representatives.

The judgment of the district court is affirmed.