**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Bonnie Kaye LITTLE, Defendant–
Appellee.**

No. 92–2155.

United States Court of Appeals,
Tenth Circuit.

March 22, 1994.

David N. Williams, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., and Larry Gomez, U.S. Atty. (succeeding Don J. Svet), with him on the briefs), Albuquerque, NM, for appellant.

David Z. Chesnoff, Goodman & Chesnoff, Las Vegas, NV (Kimberly Homan, Sheketoff & Homan, Boston, MA, with him on the briefs), for appellee.

Before SEYMOUR, Chief Judge, McKAY, LOGAN, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, and KELLY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

The government appeals from an order of the district court granting defendant/appellee Bonnie Kaye Little's motion to suppress evidence seized pursuant to a search of her luggage on board a train in Albuquerque, New Mexico. After oral argument to a panel, but prior to a decision, we ordered this case reheard in banc. Upon review of the briefs and arguments of the parties, we hold that the district court employed the wrong legal standard when it granted the motion to suppress, in that it held that our prior cases compelled the conclusion that a police-citizen encounter at a train roomette, without a specific advisement by the police officer that the defendant need not answer questions, constituted an unlawful seizure. Our prior cases dictate no such *per se* rule. We therefore REVERSE and REMAND this case for further proceedings utilizing the proper standard.

## BACKGROUND

Certain basic facts are undisputed. On January 27, 1992, Drug Enforcement Administration ("DEA") Agent Kevin Small received a tip that two passengers on the Southwest Chief Amtrak train due to arrive in Albuquerque at 1:25 p.m. might be carrying drugs. Neither of those individuals was Ms. Little.

In the course of questioning and consensually searching the luggage of those individuals, Agent Small noticed a large blue suitcase in the public baggage area of the train. The suitcase appeared to be new, was unlabelled, and, when the agent knelt down next to it, he detected "a chemical odor coming from the bag." Appellant's App., Tr. of Mo.Hr'g at 23.

Agent Small was then joined by Detective Ivan Smith of the Albuquerque Police Department, who was under assignment to the DEA Task Force, and who also apparently detected a chemical odor coming from the bag. Agent Small testified he could not identify the odor, nor could he associate it with a particular drug or drug-related activity (such as an odor-masking agent). He asked the car attendant who brought the suitcase on board the train, and was told that it was the occupant of roomette 7. He checked the train manifest and determined that the occupant of roomette 7 was Ms. Little.

Accompanied by Detective Smith, Agent Small turned on a tape recorder to record his conversation and approached roomette 7. Detective Smith stood back in the vestibule area out of sight of the roomette, while Agent Small went to the room. The door to the roomette was open and Ms. Little was sitting inside. Agent Small stood outside the room, "in the hallway," *id.* at 48, showed Ms. Little his DEA badge, told her he was with the Police Department, and asked if he could speak with her. She consented, and Agent Small proceeded to ask her a series of questions.[1]

He asked her where she was traveling, to which she responded she was traveling from California to St. Louis. Agent Small asked to see her ticket, which she handed to him, and which evidenced that she had bought a one-way ticket with cash the day before. After returning the ticket, he asked for a picture identification, and she handed the agent a Missouri driver's license belonging to Bonnie Little, with a St. Louis address on it. Agent Small promptly returned that to her as well. He then told Ms. Little that he was with the DEA, that he checked the train manifests for people traveling alone from California to the east on one-way tickets bought with cash because they sometimes carried drugs. He then asked her if she was

---

1. The actual tape of Agent Small's encounter with Ms. Little was admitted into evidence in the district court, although a transcript made of the tape by the government was not admitted by the district court because of some apparent inaccuracies in its transcription. The transcript, but not the tape, was included in the record on

appeal. We have supplemented the record on our own motion with the tape. Despite some suggestions to the contrary at oral argument of this case, the tape itself clearly indicates that Ms. Little consented when Agent Small first approached her and asked if he could speak with her.

carrying any drugs in her luggage, to which she responded she was not.

The agent testified that he had noticed a blue nylon bag next to Ms. Little. He asked her if the nylon bag was the only bag she had and she told him it was. When Agent Small asked Ms. Little if she would "voluntarily consent" to search the bag, she apparently hesitated, to which the agent responded:

> You don't have to. It's completely voluntary on your part. You don't have to let me do it. I don't have a search warrant. You're not under arrest. It's up to you.

Government's Ex. 2, tape recording. Ms. Little said she would prefer that he not search the bag.

Agent Small then asked her again if the bag was her only luggage, and she said it was.[2] The agent thereupon asked her if she would accompany him downstairs and look at something, which she agreed to do. They went to the public baggage area and Agent Small asked Ms. Little if the large blue suitcase was hers. She responded that it was. The agent asked if she would consent to having the bag searched, and Ms. Little asked if she had to consent to the search, to which Agent Small said, "No, you do not." When the agent asked her if she had packed the bag herself and if she knew what was in it, she responded that she did not know what was in the bag, that she had not packed it, but had been given the bag by a "friend" in Los Angeles and told to take it to someone else in St. Louis.

The agent then told Ms. Little that he was going to take the bag and subject it to a dog sniff because he thought it contained contraband. When a trained narcotics dog alerted to the suitcase, Agent Small arrested Ms. Little. The dog also alerted to the blue nylon bag Ms. Little had with her in the train compartment.[3] When the two bags were searched, pursuant to a search warrant, each was found to contain fifteen kilograms of cocaine.

Ms. Little was indicted for possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). She entered a plea of not guilty and filed a motion to suppress the cocaine seized from her luggage, on the ground that the luggage had been seized without a warrant and that the affidavit in support of the search warrant did not state probable cause.

After conducting a hearing on the motion, the district court granted it, reasoning as follows:

> [A] person such as the defendant in this case ha[s] a higher expectation of privacy when they engage a small room in trains.

> · · · · ·

> And here as in the *Ward* case [*United States v. Ward*, 961 F.2d 1526 (10th Cir. 1992)] the Court finds that his questioning Ms. Little in this confined space away from the public was in effect a situation where she was not permitted to decline answering questions.

> Moreover important in this case as pointed [out] in the *Ward* case is that at no time did Agent Small advise her that she could terminate the questioning.

> And I note that throughout Agent Small was very pointed in his questioning of the defendant, and he was asking incriminating questions.

> The Court in *Ward* states that in a Fourth Amendment inquiry it is relevant that an individual traveling in a private train roomette has a higher expectation of privacy than an individual traveling in a public passenger train.

> And also as here that the officer's confrontation of the defendant in a place where she had a legitimate expectation of privacy supports the conclusion, and I so

2. The government asserts that Ms. Little's responses to Agent Small's questions about whether the bag was her "only" bag amounted to a lie to Agent Small about her ownership of the blue suitcase, and that Agent Small knew she was lying. Ms. Little argues that the questions were ambiguous, and she interpreted them as questions about whether the small nylon bag in the roomette with her was her only piece of luggage *in the room with her.* The district court made no findings on this matter.

3. Agent Small testified that he never saw the dog alert to the small bag, but that another officer told him the dog had alerted to the bag.

conclude in this case, that the encounter occurred in a private, non-public setting as distinguished from an open public setting. Appellant's App., Tr. of Mo.Hr'g at 63–64. The court went on to conclude that Agent Small lacked reasonable suspicion to conclude that Ms. Little's luggage contained narcotics, so as to justify a brief detention of the luggage to subject it to a dog sniff. The court held that the chemical odor was an insufficient basis for the detention, and "the information reflected and known to agent Small was not inconsistent with innocent travel on a train by anyone." *Id.* at 65. The government appeals the district court's order granting the motion to suppress, arguing that the encounter between Agent Small and Ms. Little was consensual and that Agent Small had reasonable suspicion to detain her luggage and subject it to a dog sniff.

## DISCUSSION

■ When reviewing an order granting a motion to suppress, "we accept the trial court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to the district court's finding." *United States v. Swepston,* 987 F.2d 1510, 1513 (10th Cir.1993) (citing *United States v. Waupekenay,* 973 F.2d 1533, 1535 (10th Cir. 1992) and *United States v. Preciado,* 966 F.2d 596, 597 (10th Cir.1992)). We review de novo the "ultimate determination of Fourth Amendment reasonableness." *United States v. Allen,* 986 F.2d 1354, 1356 (10th Cir.1993). " 'If the district court's factual findings are based on an erroneous interpretation of law, a remand is appropriate unless the record is such that only one resolution of the factual issue is possible.' " *United States v. Zapata,* 997 F.2d 751, 757 (10th Cir.1993) (quoting *United States v. Nicholson,* 983 F.2d 983, 987 (10th Cir.1993)).

■ We consider first whether the district court correctly held that the encounter between Agent Small and Ms. Little was a seizure implicating the Fourth Amendment, rather than a consensual encounter. The Supreme Court in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), enunciated the test for determining whether an encounter is consensual or not:

[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Id.* 501 U.S. at ——, 111 S.Ct. at 2389. *See also United States v. Laboy,* 979 F.2d 795, 798 (10th Cir.1992); *United States v. Bloom,* 975 F.2d 1447, 1451 (10th Cir.1992). The test is objective (what would the police conduct have communicated to a reasonable person) and fact specific (based on "all the circumstances surrounding the encounter").

*Bostick* explicitly held that the particular location of an encounter is but one factor in the "totality of the circumstances" test: "[w]here the encounter takes place is one factor, but it is not the only one." *Bostick,* 501 U.S. at ——, 111 S.Ct. at 2387. Indeed, *Bostick* specifically rejected the Florida Supreme Court's application of a *per se* rule that *any* police-citizen encounter occurring inside a bus, as opposed to outside the bus or in the bus terminal lobby, constituted a seizure.[4] Rather, every case turns on the totality of the circumstances presented. When there is such a totality of the circumstances test, "only in rare instances will any one factor produce an inexorable conclusion that a seizure has occurred." *United States v. Jordan,* 958 F.2d 1085, 1086 (D.C.Cir.1992); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (reviewing cases involving voluntariness of consent, concluding that "none of them turned on the presence or absence of a

4. Even though the Florida Supreme Court disavowed the *express* application of a *per se* rule, the United States Supreme Court concluded that the Florida court in practice followed such a rule, because it routinely and consistently granted motions to suppress evidence found during encounters inside buses. Similarly, even though this court has never explicitly adopted a *per se* rule regarding encounters inside train roomettes, some lower courts attempting to apply our decisions have concluded that our court has in practice followed a *per se* rule that such encounters are seizures. *See United States v. Miller,* 811 F.Supp. 1485, 1489 (D.N.M.1993).

single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances").

■ Just as *Bostick* explicitly rejected any categorical distinctions based on the location of a police-citizen encounter on a bus (inside the bus, outside the bus, or in the bus terminal lobby), so, too, we reject the argument that the location of an encounter on a train (outside the train, in a public coach, or in a private roomette) is determinative of the seizure question.[5] Any implication to the contrary from our previous opinions is overruled.

In so holding, we recognize the difficulties in providing guidance concerning the application of a totality of the circumstances test. Such a test is "necessarily imprecise." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). However, its focus is on "the coercive effect of police conduct, taken as a whole," on a reasonable person. *Id.* at 573–74, 108 S.Ct. at 1979. It must "allow[ ] the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Id.* at 574, 108 S.Ct. at 1980. That objective is defeated by rules which give determinative weight to the location of a police-citizen encounter. *Cf. Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 519–20, 93 L.Ed.2d 473 (1986) (reviewing cases involving "coercive government misconduct" and the "crucial element of police overreaching" violative of the Due Process Clause of the Fourteenth Amendment).

In concluding that the encounter between Agent Small and Ms. Little was a seizure, the district court specifically relied in part on our statement in *Ward* that:

> it is relevant that an individual traveling in a private train roomette has a higher ex-

pectation of privacy than an individual traveling in a public passenger car of the train.... [T]he officers' confrontation of defendant in a place where he had a legitimate expectation of privacy supports the conclusion that the encounter occurred in a private, nonpublic setting....

*Ward*, 961 F.2d at 1531–32.

■ Whatever "higher" expectation of privacy a traveler may have in a private roomette, we hold that such roomettes do not confer upon occupants the same degree of privacy as a dwelling or hotel or motel room, and we overrule any contrary statement in *United States v. Dimick*, 990 F.2d 1164, 1166 (10th Cir.1993). *See United States v. Rem*, 984 F.2d 806, 812 & n. 3 (7th Cir.) (observing that privacy interest of travelers on public thoroughfares is "substantially less" than privacy interest in fixed dwellings), *cert. denied*, —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *United States v. Colyer*, 878 F.2d 469, 475–76 (D.C.Cir.1989) (rejecting defendant's argument that an Amtrak roomette is like a hotel room or apartment, finding that "[w]hile an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in the law"); *United States v. Tartaglia*, 864 F.2d 837, 841 (D.C.Cir.1989) ("[A] passenger travelling in a train roomette has a lesser expectation of privacy than a person in his home."); *United States v. Whitehead*, 849 F.2d 849, 853 (4th Cir.) ("[W]e reject the contention that a passenger train sleeping compartment is a 'temporary home' for fourth amendment purposes. While occupants of train roomettes may properly expect some degree of privacy, it is less than the reasonable expectations that individuals rightfully possess in their homes or their hotel rooms."), *cert. denied*,

---

5. Our prior opinions in *Ward* and *Bloom* both discussed the nonpublic nature of the private train roomette, on the implicit assumption that a reasonable person would feel more vulnerable to coercion in such a nonpublic place, outside the view of others. We now make two observations about that. First, it is by no means obvious that private train roomettes are always less public than other parts of a train. *See United States v. Kim*, No. Crim. 93–87, 1993 WL 175251 at * 5 (E.D.Pa. May 12, 1993) (encounter in private Amtrak roomette "not a nonpublic encounter ...

[because it was] located in a 'well-trafficked' area of the train"). Second, it is simply an assumption, unsupported by any specific data or evidence, that a person in a private train roomette, not in the view of other passengers, will feel more vulnerable to coercion than a person who *is* in the view of other people. It may be that many people would in fact feel more "coerced" in a public setting, where they might be embarrassed to decline police requests in the hearing and view of others.

488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988).

We need not determine the precise level of any "higher" expectation of privacy in a train roomette, however, because any such expectation of privacy has only a limited relevance to the question of whether a police-citizen encounter in such a roomette is consensual. "While a person's 'higher expectation of privacy' in his or her train compartment would have some relevance if we were reviewing a search of the compartment, it has limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate the encounter." *United States v. Bloom,* 975 F.2d 1447, 1453 n. 6 (10th Cir.1992); *cf. INS v. Delgado,* 466 U.S. 210, 217 n. 5, 104 S.Ct. 1758, 1763 n. 5, 80 L.Ed.2d 247 (1984) (stating that "the same considerations attending contacts between the police and citizens in public places" apply to contacts "inside a factory, a location usually not accessible to the public").

■ In addition to the train roomette setting of the encounter between Agent Small and Ms. Little, the district court also emphasized Agent Small's failure to specifically advise Ms. Little that she had the right to refuse to answer his questions. There is no *per se* rule requiring such an advisement. *See Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762; *Schneckloth v. Bustamonte,* 412 U.S. 218, 231, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973); *United States v. Zapata,* 997 F.2d 751, 757 n. 4 (10th Cir.1993); *United States v. Laboy,* 979 F.2d 795, 799 (10th Cir.1992); *Bloom,* 975 F.2d at 1454–55; *Ward,* 961 F.2d at 1533.

Moreover, Agent Small did specifically tell Ms. Little that she need not acquiesce to a search of her luggage. While we do not suggest that an advisement concerning answering questions is the same as an advisement concerning the search of luggage, in this case Agent Small's unambiguous and explicit advisement concerning the search of her luggage is relevant to the totality of the circumstances surrounding the encounter.

■ We reject Ms. Little's argument that "because Ms. Little was a woman traveling alone, she, as the defendant in *Ward,* would be more easily intimidated than some other person." Am. Appellee's Answering Br. at 20. While in *Ward* we observed that the defendant's "slight physique" and the fact that he had "recently undergone a kidney transplant for which he was still taking medication" suggested that he "was more easily intimidated than some other persons," *Ward,* 961 F.2d at 1533, subsequent opinions have more clearly stated our view of the propriety of considering the particular personal traits or subjective state of mind of the defendant. We stated in *Bloom,* and reiterated in *Laboy* and *Zapata,* that the particular personal traits or subjective state of mind of the defendant are irrelevant to the objective "reasonable person" test set out in *Bostick,* "other than to the extent that they may have been known to the officer and influenced his conduct." *Bloom,* 975 F.2d at 1455 n. 9; *see also Zapata,* 997 F.2d at 757; *Laboy,* 979 F.2d at 799.[6] Thus, unless there is evidence that Agent Small knew of any particular personal traits or characteristics of Ms. Little, and they influenced his conduct, they are irrelevant to the question of whether the encounter between Agent Small and Ms. Little was consensual. And we reject any rule that would classify groups of travelers according to gender, race, religion, national origin, or other comparable status.[7]

■ Finally, we turn to the district court's reliance on the fact that "Agent Small was very pointed in his questioning of the defendant, and he was asking incriminating questions." Appellant's App., Tr. of Mo.Hr'g at

---

6. Characteristics such as whether the person being questioned is a child or an adult, for example, are objective and relevant.

7. The dissent finds this statement "surprising" and fears it may be interpreted by district courts as a repudiation of part of our opinion in *Zapata,* 997 F.2d at 759. The dissent only reaches those conclusions by completely misinterpreting our statement. Of course age, gender, education and intelligence may be relevant in any *particular* case, to the extent they are objectively apparent. They should *not,* however, form the basis for general across-the-board categorizations of groups of travelers. Thus, what we reject are rules which state or imply that *all* women, *all* minorities, or *all* young people are always more vulnerable to coercion.

63. The asking of "incriminating questions" is irrelevant to the totality of the circumstances surrounding the encounter. Indeed, *Bostick* specifically observed that police officers ask such questions, and in no way suggested that there is anything unlawful in the practice. *Bostick,* 501 U.S. at ——, 111 S.Ct. at 2384.

■ Having clarified the appropriate legal standard governing the encounter between Agent Small and Ms. Little, we now consider whether the district court applied that standard in granting Ms. Little's motion to suppress. We hold it did not. While not explicitly embracing any *per se* rules regarding encounters in train roomettes, the district court apparently gave determinative weight to both the roomette setting and to the failure to specifically advise Ms. Little that she need not answer questions, in the belief that *Ward* so dictated. In so doing, the district court, like the Florida court in *Bostick,* failed to fully explore the totality of the circumstances surrounding the encounter.[8] We accordingly reverse the grant of the motion to suppress and remand this case for further proceedings, employing the correct legal standards governing police-citizen encounters. Anything in prior opinions that is contrary to the views expressed herein is overruled.

■ Because we remand this case for further proceedings, we do not reach the question of whether Agent Small had reasonable suspicion to detain Ms. Little's luggage and subject it to a dog sniff. We do hold, however, that the record in this case clearly indicates that Agent Small did not have reasonable suspicion to detain the luggage prior to his encounter with Ms. Little. An unidentified chemical smell emanating from an unlabelled piece of luggage is not, by itself, sufficient to create reasonable suspicion. Cases generally require the officer to be able to link the smell to a particular controlled substance or illegal activity. *See, e.g., United States v. Morin,* 949 F.2d 297, 299 (10th Cir.1991) (probable cause based in part on the "strong odor of marijuana in the vicinity of the two bags"); *United States v. Mueller,* 902 F.2d 336, 339 (5th Cir.1990) (affidavit stating detection of "strong chemical odor of those chemicals commonly used in the manufacture of Methamphetamine" along with other statements established probable cause); *United States v. Romero,* 692 F.2d 699, 703 (10th Cir.1982) ("Officer ... was an experienced policeman familiar with the odor of marijuana. This odor, combined with [other factors] gave the officers probable cause...."); *see also United States v. McKneely,* 810 F.Supp. 1537, 1543 (D.Utah) ("An unidentifiable [chemical] smell alone is not sufficient to create a reasonable suspicion."), *rev'd on other grounds,* 6 F.3d 1447 (10th Cir.1993).[9]

For the foregoing reasons, we REVERSE and REMAND this case for proceedings consistent herewith.

PAUL KELLY, Jr., Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion, with the exception of overruling the statement in *United States v. Dimick,* 990 F.2d 1164, 1166 (10th Cir.1993), that private sleeper cars on passenger trains can be comparable to hotel rooms where an occupant enjoys a heightened expectation of privacy. Ct.Op. at 1504. *Dimick* is correct and faithful to circuit precedent when taken in context. *Dimick* involved a *search* of a private sleeper car without consent or probable cause and followed *United States v. Bloom,* 975 F.2d 1447, 1453 n. 6 (10th Cir.1992), which expressly indicated that a higher expectation of privacy in a train compartment would have relevance in

---

8. On remand from the United States Supreme Court, the Florida Supreme Court in *Bostick* simply affirmed, without discussion, the lower court's decision denying Mr. Bostick's motion to suppress. *Bostick v. Florida,* 593 So.2d 494 (Fla. 1992) (per curiam). No appeal has been taken.

9. In holding that Agent Small lacked reasonable suspicion to detain Ms. Little's luggage and subject it to a dog sniff, the district court observed that "the information reflected and known to Agent Small was not inconsistent with innocent travel on a train by anyone." Appellant's App., Tr. of Mo. Hr'g at 65. On remand, the district court should consider that factors "quite consistent with innocent travel" may "taken together ... amount to reasonable suspicion." *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989).

the search context. This case involves a *seizure*, with a different analytical framework. *See Florida v. Bostick*, 501 U.S. 429, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991). While I agree with the court that location is not determinative of whether an encounter is consensual or a seizure, Ct.Op. at 1503-04, I respectfully dissent from going further and using the statement in *Dimick*, which pertains to searches, as an opportunity to say, be it search or seizure, that an occupant cannot have a comparable level of privacy in a compartment that one would have in a hotel or motel room. To do so is inappropriate, I believe, because the expectation of privacy issue, as it pertains to searches, simply is not before us in this seizure case.

LOGAN, Circuit Judge, with whom SEYMOUR, Chief Judge, and McKAY, Circuit Judge, join, dissenting:

## I

Insofar as the majority opinion holds that Agent Small did not have reasonable suspicion of criminal activity to justify detaining defendant Little or her luggage before their initial encounter, I am in agreement. Small had boarded the train to check out two other passengers; he questioned them, induced them to let him search their baggage (and in one case the passenger's person), but found nothing incriminating. Small focused on defendant only because he saw a new suitcase with no name tag on the rack where passengers placed their bags outside the roomettes, and a train attendant identified it as defendant's. Obviously the suitcase's physical appearance and location provided no grounds

for reasonable suspicion; train passengers can and do carry on their own luggage, sometimes old but sometimes new, and place it where it can be retrieved at their will.

Apparently because they are suspicious of almost everyone, Small and the officer who accompanied him decided to do their own human sniff of defendant's luggage. They detected an odor they could not identify as the odor of any drug or any masking agent.[1] I attribute no significance to the statement that they smelled a "chemical" odor, because all odors are chemical. Thus, I agree that the agent had no articulable suspicion to justify questioning defendant, and the case must be viewed in the same posture as the encounter in *Florida v. Bostick*, 501 U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

## II

It also seems clear that defendant in fact felt compelled to answer the agent's questions. Consider that this woman had in her bag in the roomette fifteen kilograms of cocaine, and in another bag outside on the luggage rack another fifteen kilograms of cocaine. While she disclaimed knowledge of the contents of the bag in the public luggage rack under persistent questioning by the officer, she never denied knowledge of the contents of the bag in the roomette. It is fanciful to suppose that she did not know she was carrying contraband in one or both bags. This was the context in which the agent asked to speak to defendant.

I have more problems with the tape than does the majority.[2] Nevertheless, reviewing

---

1. There is no evidence in the record that any masking agent was used to attempt to cover the odor of the cocaine found in defendant's luggage.

2. The tape introduced into evidence is close to indistinct with respect to defendant's answer to Agent Small when he asked if he could speak to her. Small testified that she consented, and after listening several times I agree that defendant's response can be understood to be "uh-huh." Nevertheless, the transcript Small prepared himself, offered as Plaintiff's Exhibit 2–A, lists defendant's answer as "huh-uh," a "no." Also, at the suppression hearing when cross-examined about his voice sounding "very rushed" on the tape, Small explained that in part it was a result of the tape, stating that he had transferred the conver-

sation from one tape to another: "The original tape is a micro-cassette, and I had to transfer it over to a larger tape and then—at the beginning of the tape I sound like Mickey Mouse, and that's somewhere in the—transferring the tape over...." Appellant's App. 44.

The tape introduced into evidence may be the original tape; it has on it the conversations of the encounters with the other two passengers during which Small found nothing incriminating. It also has a completely silent stretch, with no background or train noise, unlike the rest of the tape, for more than one minute just after Small told the second passenger that he would have to confer with his fellow officer about whether to let that passenger proceed and just before Small's

the tape introduced into evidence, it is apparent that defendant answered the agent's questions with the least response possible, as would one who felt coerced. When informed, after her questions, that she need not allow the agent to examine her baggage for drugs, both times she refused consent. Because she knew the officer wanted to search her luggage for drugs, it seems obvious that she would not have accompanied the officer to the outside luggage rack had she felt she had a choice. No one listening to the tape could believe that this defendant thought that co-operating with Small would deter him from searching her luggage or that a search would not uncover the drugs. She felt coerced in fact.

I recognize that the test is not whether defendant in fact felt coerced; the test is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at ——, 111 S.Ct. at 2387. There apparently are no empirical studies of how a reasonable person, a reasonable innocent person, would react in similar circumstances. The "reasonable person" exists only in the minds of the judges who adjudicate these matters.[3] The Supreme Court says we must evaluate such matters with "common sense and ordinary human experience." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

### III

I agree with the majority that our principal guidance for deciding a case like that before us comes from *Bostick*. There the Supreme Court announced a totality of the circumstances test applicable to encounters on a train as well as a bus. Read narrowly, *Bostick* merely held there is no per se rule requiring a court to find a seizure in violation of the Fourth Amendment when encounters occur between passengers on a bus and police officers asking questions without articulable suspicion. The Court did not decide that no seizure occurred under the facts of that case, but stated that the Florida court must apply a totality of the circumstances evaluation in determining whether "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at ——, 111 S.Ct. at 2389.

The lower courts, however, have read *Bostick* more broadly, as a holding on the facts there before the Court that no unconstitutional seizure occurred. This may be because the Court, in addition to saying that the case should be remanded to evaluate the seizure under the correct legal standard, asserted that the "question to be decided ... on remand is whether Bostick chose to permit the search of his luggage," *id.* 501 U.S. at ——, 111 S.Ct. at 2388, which appears to assume there was no seizure. On remand the Florida Supreme Court simply reversed its prior position suppressing the evidence in a brief unreasoned per curiam opinion. *Bostick v. State*, 593 So.2d 494 (Fla.1992).

Lower courts have essentially compared their cases with the circumstances in *Bostick*, or referenced therein, weighing toward coercion—that the officer asked potentially incriminating questions, that he partially blocked the only possible exit, and that one officer had his hand in a recognizable pouch that contained a gun—and held no Fourth

opening question to defendant. These items disturb me. But I would not hold that the success of the government's appeal turns on the accuracy of the tape.

**3.** I assume the reason no empirical studies have been made is that realistic scenarios would have to be performed by police, who are reasonably satisfied with the way the courts decide this issue, or by persons impersonating police officers, which would subject them to criminal liability for impersonating police officers. It would help if lawyers would put their clients on the stand in these cases. *See Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."). Defendants may run some risks by testifying, *see Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (evidence obtained in violation of *Miranda* may be used to impeach defendant at trial), but if the case turns on whether the evidence is suppressed they have nothing to lose by testifying to the circumstances surrounding the officer's interrogation.

Amendment violation occurred if the situation then before them was no more intimidating than that. Indeed, like the majority opinion here, some courts appear to treat factors that may be considered nonthreatening—that the officers were wearing civilian clothes, that no gun was visible, and that they used a conversational tone in questioning—as not merely neutral, but as offsetting other facts which would weigh toward coercion.

In applying *Bostick*'s balancing test, however, whether we view the encounter as violating constitutional limits often will depend on how close we think the *Bostick* facts came to the line of unconstitutional behavior. I believe, obviously contrary to the majority, that the conduct *Bostick* appeared to approve was near the extreme limit of a constitutionally permissible consensual encounter.

## IV

The commentators almost unanimously have condemned the *Bostick* opinion as going too far.[4] Commentators, of course, do not make the law; the Supreme Court does.

But this universal criticism is some indication that the Supreme Court might not reach the same result if the facts contained features less favorable to the police questioners than were present in *Bostick*. In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held that police officers violate the Fourth Amendment when they make stops of automobiles on a random basis without articulable suspicion. That is not a far cry from the bus or train case where the encounter is with passengers in a vehicle stopped for reasons unrelated to the policeman's activity, but where the policemen are acting with the cooperation of the public carrier.

### A

In *United States v. Ward*, 961 F.2d 1526 (10th Cir.1992), writing for the panel, I perceived two differences from the situation in *Bostick* that I thought weighed substantially in favor of finding an unlawful seizure rather than a consensual encounter. First was that the officers in *Ward*, one of whom was Agent

---

4. *See, e.g.*, Wayne R. LaFave, *Search and Seizure* § 9.2(A) at 117, 120 (Supp.1993) ("Even if it is generally true that police encounters with pedestrians, including travelers who become ensnared in drug courier detection activities at airports, are *not* seizures, the confrontations which occur on buses as a part of suspicionless police sweeps nonetheless ought to be deemed seizures because they are dramatically different in terms of the character of the police activity involved and its impact upon the reasonable traveler. This difference, essentially, comes down to these two propositions: (i) the police dominance of the situation manifested by their sweep activity, undertaken with the obvious connivance of the common carrier to which bus travelers have entrusted their care, is highly coercive because it is so unlike any contact which might occur between two private citizens; (ii) that dominance has a uniquely heavy impact upon bus travelers precisely because they do not, as a practical matter, have available the range of avoidance options which pedestrians and airport travelers might utilize.... [I]t is troublesome that the *Bostick* majority does *not* seem to grasp either the uniqueness of on-bus confrontations or the particular difficulties which passengers who do not wish to submit to such an encounter face."); *The Supreme Court—Leading Cases*, 105 Harv.L.Rev. 177, 305 (1991) ("The Court's reasoning ... does not recognize that the police, by approaching individuals in environments where they face obvious—even if voluntarily assumed—constraints on mobility, purposefully reduce the likelihood

that a citizen will exercise his right not to be interrogated. Such rulings give the police a perverse incentive to seek out individuals in places—such as buses—where external factors discourage exit.") (footnotes omitted); Michael J. Reed, Comment, Florida v. Bostick: *The Fourth Amendment Takes a Back Seat to the Drug War*, 27 New Eng.L.Rev. 825 (1993) ("If, as the majority in Bostick states, the reasonable person is aware that he has the right to refuse consent, then the individual would have no need to risk being caught trying to bluff and would simply refuse consent. If, however, he did not feel free to refuse consent, he would grant it because he felt compelled to do so. In short, if the environment in Bostick, and cases like it, is not coercive, how could it be an effective law enforcement tool? In other words, why would it ever work?") (footnote omitted); Matthew I. Farmer, Note, *Go Greyhound and Leave the Fourth Amendment to Us*: Florida v. Bostick, 23 Loy.U.Chic.L.J. 533 (1992) ("[T]he Court's latest statement on the consent-coercion question implicitly credits the 'reasonable person' with an inordinate amount of Fourth Amendment knowledge."); *see generally* Mark W. Fry, Note, Florida v. Bostick: *Swapping-Off Point for Fourth Amendment Protections?*, 52 La.L.Rev. 1183 (1992); *Constitutional Law Conference Addresses Supreme Court's 1990–91 Term*, 50 Crim.L.Rep. 1086 (1991) (Prof. Yale Kamisar).

**1510**

Small, did not inform the defendant at the outset of the encounter that he need not answer his questions. I believe this is an important factor because the *Bostick* majority opinion mentioned as a fact "particularly worth noting" that before asking questions the officer did notify the passenger that he need not cooperate. *Bostick*, 501 U.S. at ——, ——, 111 S.Ct. at 2385, 2388; *see also United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (fact that defendant was told she could decline to consent was "especially significant"). Agent Small, in the case now before us, did not inform defendant at the outset, or at any time, that she need not answer his questions.

### B

The second difference I perceived in *Ward* to weigh substantially in favor of a coercive encounter was the locus of the questioning in a roomette, with only officers and the defendant present, isolated from neutral witnesses. This was not a factor emphasized in *Bostick*; but it is clear that the encounter in the bus occurred where other passengers would witness the questioning. The majority opinion in the instant case believes that the district court treated the location of the encounter in the roomette as determinative of the seizure question and it rejects that view. It then goes on to suggest that whatever expectation of privacy a train passenger has in a roomette it "has only a limited relevance to the question of whether a police-citizen encounter in such a roomette is consensual," Maj. op. at 1504–05, and additionally suggests that people might feel more coerced when confronted by police in a public setting in view of others.

I do not contend, nor do I believe the district court found, that the location of the police encounter is "determinative" of the seizure question. But I do contend, based upon Supreme Court precedent as well as common sense, that it is an important factor. On more than one occasion the Supreme Court has recognized the importance of location in the seizure determination. In *Bostick*, the Court stated that "the Fourth Amendment permits police officers to approach individuals at random *in airport lobbies and other public places* to ask them questions and to request consent to search their luggage...." *Bostick*, 501 U.S. at ——, 111 S.Ct. at 2384 (emphasis added). Later the Court noted that no seizure would have occurred if the police confronted Bostick before he *"boarded the bus or in the lobby of the bus terminal,"* id. 501 U.S. at ——, 111 S.Ct. at 2386 (emphasis added), both places where witnesses are likely to be present. *See also Florida v. Rodriguez*, 469 U.S. 1, 4, 105 S.Ct. 308, 309, 83 L.Ed.2d 165 (1984) (noting specifically that police and defendant "remained in public area of the airport," and finding no seizure under Fourth Amendment) (per curiam).

Similarly, in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court found an encounter in an air terminal was a seizure violating the Fourth Amendment. The *Royer* Court emphasized that the agents brought Royer to a one-exit room which the Court described as "a small room—a large closet—equipped with a desk and two chairs"; it then stated that "[w]hat had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room." *Id.* at 502–03, 103 S.Ct. at 1327. In my view the train roomette in the case before us, no larger than eight feet by two or three feet,[5] is essentially similar to a large storage closet with only one exit.

5. Agent Small testified as follows with respect to the size of defendant's roomette:
   Q. (By Mr. Chesnoff) Sir, how big was the room?
   A. It's probably eight feet long by two, three feet wide.
   Q. Okay; is this a sleeping car?
   A. Yes, sir.
   Q. So there's a bed, a chair—a bed and a chair in a room that's eight by two?

A. Maybe eight by three. It's actually two beds. There's two chairs and two beds. And the two lower chairs make out to a bed at night-time, and the upper berth is pulled down at night, so you have two beds.
Appellant's App. at 49–50. He also testified that "most rooms on the train don't have enough space for large pieces of luggage." *Id.* at 39.

The majority holds that the passenger's privacy right in a train roomette is not as great as in her home, and that such fact requires overruling Judge Kelly's opinion for the panel in *United States v. Dimick,* 990 F.2d 1164, 1166 (10th Cir.1993). Of course, *Dimick* was a search case, not a seizure of the person, and I believe it was correctly decided. I share the view that a passenger renting a roomette on a train does not have the same expectation of privacy as a homeowner. Homeowners may exclude almost anyone from their property; train roomette renters pay for the privacy of traveling in isolation from other passengers but expect to let the conductor in to check their tickets, and other train employees to announce the next stop or to check a mechanical problem. As relevant to the seizure issue before us, however, I believe the train passenger in a roomette would feel less able to refuse to answer questions posed by a police officer, especially one who looked like he might be connected to the railroad or to have been asked by the railroad to make inquiries. Thus, the lesser privacy interest actually supports finding a more coercive atmosphere in the train roomette than when a person is questioned at the door of her home. The passenger's privacy expectation in the roomette may be of limited relevance, but it is relevant.

As to the majority's dictum that many people in a public setting, where there are other neutral observers, would feel more embarrassed and more coerced into responding to police questioning than when in the privacy of a roomette, I disagree, and I think the Supreme Court does also. In holding that *Miranda* warnings need not be given to motorists in ordinary traffic stops, the Supreme Court explicitly held that public settings are inherently less coercive.

> [T]he typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse.

*Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984).

This same reasoning should apply to police encounters when we analyze whether a reasonable person would feel free to refuse an officer's requests or to otherwise terminate the encounter.

My point in *Ward* and my point here is that the main problems of questioning in the roomette setting are the cramped confines, like that regarded as coercive in *Royer,* and the absence of neutral eye witnesses. The majority apparently believes that if the roomette setting of the interview is given an "important" label, all such encounters will necessarily be found to be seizures—a per se rule. I do not agree with that conclusion. One factor that diminishes the importance is the existence of a tape recording, as here. But even when there is a tape, it often seems to malfunction just when the court would like to know what was said; it may not record accurately the tone of voice of the parties; and, of course, it cannot show the nonverbal behavior of the officer. These defects can be neutralized in particular cases, however, if there is another passenger or visitor who witnesses the encounter, who can be a neutral observer of the police behavior.

### C

The tape and testimony in the instant case contains additional evidence to support the district court's finding of a coercive atmosphere created by the confrontation and questioning of defendant. First, the agent's proximity to defendant: Although Agent Small testified at one point that he didn't remember "stepping foot" in defendant's tiny roomette, Appellant's App. 47, and that he stood in the hallway, *id.* at 48, he also said, "These rooms are very tiny. She could keep her seat and hand [the ticket] to me. When she sticks her arm out, her hand is probably in the hallway, very small room." *Id.* at 49. Earlier he had testified that he "stood on the north part of the room." *Id.* at 25. *See Royer,* 460 U.S. at 502–03, 103 S.Ct. at 1326–27.

Second, the agent's questioning technique: Almost at the outset his questions were focused: "[W]e look for people who bought tickets yesterday, traveling by themselves, *as you are*, traveling back East carrying drugs." Pl. ex. 2; *id.* 2–A (emphasis added). Small's questioning did not stop after defendant denied him permission to examine the bag in her roomette. He immediately asked her to accompany him outside the room. As he left he made an aside to his fellow officer that is almost but not quite inaudible: "Maybe, but we'll get her after the suitcase." Pl. ex. 2. When defendant readily identified the bag on the rack outside as hers and denied Small permission to search it, he continued to question her about whether she knew what was in the bag and whether she had packed it. At that point defendant responded that she did not know what was in the bag and had not packed it; she stated that a friend had given her the bag for delivery to another. Small then indicated quite clearly that he intended to hold the bag after the train left the station and would send it to her if it contained nothing illegal. He made no mention of holding for a dog sniff, but referenced only his intent to secure a search warrant to enable him to look into the bag.[6]

The majority states that asking incriminating questions is irrelevant to the totality of the circumstances. While it may be difficult for an officer to do his job without asking questions that are in some ways incriminating, "an officer's use of language or a tone of voice in a manner implying that compliance with the [police] request might be compelled," *United States v. Griffin,* 7 F.3d 1512, 1519 (10th Cir.1993) (Brorby, J.), is certainly relevant to the seizure question. Direct, focused, or prolonged accusatory questioning in a commanding tone of voice is likely to make a reasonable innocent person feel coerced and unable to terminate a police

encounter. *See id.* at 1518. Because the majority opinion appears to distinguish between police questions, that are by necessity sometimes "incriminating," and police questioning techniques that are likely to be coercive, I assume the majority does not intend a major break from our prior case law. *See also United States v. White,* 890 F.2d 1413, 1416 (8th Cir.1989) (officer's comment that defendant fit characteristics of drug criminals could lead defendant to reasonably believe he was not free to terminate encounter), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990); *United States v. Savage,* 889 F.2d 1113, 1115, 1117 (D.C.Cir.1989) (when officer's questions of defendant in train private roomette became direct and focused on assumed name, encounter became seizure); *United States v. Gonzalas,* 842 F.2d 748, 752 (5th Cir.1988) (defendant seized when officer told her he was working narcotics and asked to search her bag), *overruled on other grounds by United States v. Hurtado,* 905 F.2d 74 (5th Cir.1990) (in banc).

### D

Defendant is a black woman who was traveling alone. The majority correctly notes that the test for determining whether a seizure has occurred is an objective one, and that the personal traits or the subjective state of mind of a defendant are irrelevant except to the extent such traits are observable to the officer. However, the majority rejects any argument that defendant's status as a black woman traveling alone has an effect on whether a reasonable person in her situation might feel coerced. Even more surprising, the majority makes the broad statement that "we reject any rule that would classify groups of travellers according

6. There was no articulable suspicion justifying a seizure of defendant's bags until the continued questioning by the agent, after the second refusal to permit inspection of the bags, evoked the answer from defendant that she had not packed, but had been given, one of her bags by another for delivery. Then, if the questioning was permissible, under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), sufficient suspicion existed to justify a temporary detention of the bag. Agent Small then indicated his inten-

tion to keep the bag after the train was to leave the station. While I believe that such detention on mere *Terry*-type suspicion would violate defendant's rights under the authority of *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and that in effect we have so held in *United States v. Dimick,* 990 F.2d 1164 (10th Cir.1993), we do not have to decide that issue here. The dog was secured in time to make the sniff that created probable cause to arrest before the train left the station.

to gender, race, religion, national origin, or other comparable status." Maj. op. at 1512. Despite footnote six in the majority opinion I fear these comments will be read by the district courts as a repudiation of that part of *United States v. Zapata,* 997 F.2d 751, 759 (10th Cir.1993), in which Judge Anderson, writing for the panel, acknowledged that "such attributes as the age, gender, education, and intelligence of the accused have been recognized as relevant," citing *United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980), and *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

*Mendenhall,* at the point in which the Court was determining whether the defendant had been seized, states,

> it is argued that the incident would reasonably have appeared coercive to the respondent, who was 22 years old and had not been graduated from high school. It is additionally suggested that the respondent, a female and a Negro, may have felt unusually threatened by the officers, who were white males. While *these factors were not irrelevant,* ... [citing *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047], neither were they decisive.

7. If it is relevant that the officer is in plain clothes rather than in uniform, it should be relevant that the officer has the physique of a tackle for the Dallas Cowboys and is questioning an obviously retarded underweight thirteen-year old.

8. The court's findings, because they were oral, are perhaps not a model; but they comment on the most relevant factors and I cannot read them as pronouncing a per se rule. They are as follows:
   > The only information that Agent Small had to single out this defendant to question was that he detected a chemical odor from the bag and that it had no tags, although he knew who owned the bag.
   > At that point there was absolutely no information or anything to lead Agent Small to have any reasonable suspicion for any investigative detention.
   > And here as in the Ward case the Court finds that his questioning Ms. Little in this confined space away from the public was in effect a situation where she was not permitted to decline answering questions.

446 U.S. at 558, 100 S.Ct. at 1879 (emphasis added). *Schneckloth* states:

> In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the *youth of the accused, his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights....*

412 U.S. at 226, 93 S.Ct. at 2047 (citations omitted) (emphasis added). The cases cited in *Schneckloth* related to the voluntariness of confessions, which the Court believed applied to the consent to search issue involved there. In the case before us the issue is whether the contact between the officer and defendant was a consensual encounter or a seizure. Some of the objective factors relevant to whether a search was consensual would surely apply in determining the seizure issue.[7] This court cannot overrule those Supreme Court holdings, and I presume does not intend to cabin them unduly.

## V

After carefully examining the record, I am satisfied that the district court did not apply a per se test or an erroneous one.[8] The

> Moreover important in this case as pointed in the Ward case is that at no time did Agent Small advise her that she could terminate the questioning.
> And I note that throughout Agent Small was very pointed in his questioning of the defendant, and he was asking incriminating questions.
> The Court in Ward states that in a Fourth Amendment inquiry it is relevant that an individual traveling in a private train roomette has a higher expectation of privacy than an individual traveling in a public passenger train. And also as here that the officer's confrontation of the defendant in a place where she had a legitimate expectation of privacy supports the conclusion, and I so conclude in this case, that the encounter occurred in a private, nonpublic setting as distinguished from an open public setting.
> I further find that at the time Agent Small—at the time that Agent Small asked the defendant to accompany him to the baggage area, again he did not advise her that she was not required to do so, and I find that under the circumstances she was led to—at least she could

court applied a balancing test. It weighed as coercive the failure of the agent to state that defendant need not answer the officer's questions; it weighed as coercive the environs of the small roomette with one exit, similar to the setting condemned in *Royer*; and it weighed as coercive the officer's persistent questioning of an accusatory nature. Perhaps the district court believed that what apparently was approved by *Bostick* went about as far as the law permits, and that these additional coercive factors tipped the scale against the police.

Because I view *Bostick* as a case close to the line of unconstitutional questioning, I would hold that the district court properly treated these important additional factors, tending toward coercion, as enough to make this encounter an unconstitutional seizure absent substantial offsetting factors. Here there are no factors more favorable to the prosecution than in *Bostick* except that one officer stood back out of sight until defendant was brought to the baggage area to view her second bag. Until both officers were present, however, defendant made no statements that would raise suspicion to the *Terry* level.

Therefore, I believe the case before us is one in which the Supreme Court would condemn the questioning as a seizure violative of the Fourth Amendment. I would affirm the district court's suppression order.

It is very hard to vote to suppress evidence that will result in allowing this criminal, carrying thirty kilos of cocaine, to go free. But our decision has implications far beyond the facts of this case.[9] The jurisprudence of the Bill of Rights calls upon the courts to make judgments with an emotional content not present in almost any other litigation. If we seek answers in the original intent of the framers of the Constitution, there were no trains, airplanes or buses when the Bill of Rights was adopted. Perhaps the only common carrier was a sailing ship, in which only the captain may have had a private cabin. Nevertheless, the colonists had participated in a revolution, had violated laws imposed upon them by the English sovereign, and the architect of the Bill of Rights, Thomas Jefferson, believed that revolution against established government on some regular basis was desirable.[10] It is not hard for

---

reasonably believe that she had to comply with Agent Small's commands to accompany her (sic).

Upon asking—and again even to that point there were no suspicious circumstances to lead Agent Small to believe that a crime was being committed.

Once she identified the bag as being hers, and again he proceeded to ask incriminating questions, and based upon—and informed her that he was going to take her bag because he suspected that there were narcotics in the suitcase.

There's nothing here to indicate on what he bases that information other than he himself concluded I presume from what he described as a chemical odor that there was something suspicious in the bag.

. . . .

Here the information reflected and known to Agent Small was not inconsistent with innocent travel on a train by anyone, and he did not have any reasonable basis to arise to a reasonable suspicion that the defendant was committing a crime, therefore he did· not have the right to seize the luggage.

I further note for the record that I find that he also seized the person of the defendant at the time he—or he asked her to accompany him to the baggage area.

Appellant's App. at 63–65.

9. Justice Jackson well stated the importance of the Fourth Amendment not long after his return

from presiding over the Nuremberg war crimes trials:

> Fourth Amendment freedoms ... are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.
>
> But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.

*Brinegar v. United States*, 338 U.S. 160, 180–81, 69 S.Ct. 1302, 1313–14, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting).

10. "I hold it, that a little rebellion, now and then, is a good thing, and as necessary in the political world as storms in the physical." Thomas Jefferson, letter to James Madison, Jan. 30, 1787 (quoted in *Bartlett's Familiar Quotations*, 15th ed. 1980).

me to believe that these founders would consider the Fourth Amendment violated if police officers used tactics like those before us to seek to examine the luggage and saddle bags of travelers on the public thoroughfares that existed in colonial times.

Today the search is for cocaine and other outlawed drugs; tomorrow it is likely to include tobacco, surely on the endangered list, and perhaps even alcohol.[11] And how many travelers have lawful possessions in their luggage that they do not care for others to see; items that they will be pressured into revealing by police officers boarding trains, planes and buses acting out what is permitted by the instant decision? *See Florida v. Kerwick*, 512 So.2d 347, 348–49 (Fla.App.1987) (a single officer employing sweep technique was able to search over 3,000 bags in a nine-month period). The majority has stretched what is permissible under the Fourth Amendment further than I can accept and further than I believe the Supreme Court would permit. I therefore dissent.

11. *See State v. Bieber*, 121 Kan. 536, 247 P. 875 (1926), disbarring a lawyer who pleaded guilty to the misdemeanor of unlawful possession of intoxicating liquor (a small quantity found on the back porch of the lawyer's home).