PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 22 2004**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAMIR HEDI BEN ABDENBI,

Defendant - Appellant.

No. 02-1435

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 02-CR-180-B)

John T. Carlson, Office of the Federal Public Defender (Michael G. Katz, Federal Public Defender, and Charles Szekely, Assistant Federal Public Defender, on the briefs), Denver, Colorado, for Defendant - Appellant.

James C. Murphy, Assistant United States Attorney (John W. Suthers, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff - Appellee.

Before **MURPHY** , Circuit Judge, **BRORBY** , Senior Circuit Judge, and **McCONNELL** , Circuit Judge.

**MURPHY** , Circuit Judge.

## I. Introduction

Defendant-appellant Samir Hedi Ben Abdenbi was charged, *inter alia*, with one count of fraud and misuse of a government identity document, in violation of 18 U.S.C. § 1546(a). He thereafter filed a motion to suppress all evidence discovered as a result of statements he made to federal agents during a warrantless search of his apartment. Abdenbi entered into a plea agreement wherein he agreed to plead guilty but preserved his right to appeal the district court's ruling on his motion to suppress. The district court denied Abdenbi's suppression motion, concluding that the encounter between Abdenbi and three federal agents which occurred in Abdenbi's apartment was wholly consensual.[1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the denial of Abdenbi's motion to suppress.

## II. Factual Background

In February 2002, Kenneth Grubb, a special agent criminal investigator for the Social Security Administration Office of the Inspector General, received information from INS special agent Ross Godwin concerning a social security application. Agent Grubb was told that an individual named Janis Habib Jlassi

---

[1]The district court also ruled, in the alternative, that the agents' questioning was proper because they had a reasonable articulable suspicion that Abdenbi was engaged in criminal activity. Because we hold, *infra*, that the encounter between Abdenbi and the agents was consensual, a discussion of the district court's alternative ruling is unnecessary.

had applied for a social security card using documents the INS suspected were false. Based on his review of the information provided by the INS and his subsequent investigation, Agent Grubb formed a belief that Jlassi was in the United States illegally. To confirm this belief, Grubb concluded that he needed to speak with Jlassi. Agent Godwin agreed to accompany Agent Grubb to the address Jlassi had provided on his social security application. Agent Grubb testified that his objective was to "speak to Mr. Jlassi and basically conduct an interview with him and see if . . . he had submitted that application to Social Security."

On the morning of April 10, 2002, at approximately 6:15 a.m., Agents Grubb and Godwin arrived at Jlassi's apartment. They were accompanied by INS special agent Jayson Mallard. The agents did not have either an arrest warrant for Jlassi or a search warrant for the apartment. All three were dressed in street clothes and each carried a gun concealed by his clothing. Agent Godwin knocked on the apartment door and it was opened by Jlassi's roommate, Amour Bejaoui. The agents displayed their badges and asked Bejaoui if Jlassi was in the apartment. Bejaoui confirmed that Jlassi was asleep in the apartment. Grubb testified that the agents then "requested entry to the apartment so we could speak with Mr. Jlassi." Agent Mallard testified that Bejaoui opened the door, stepped aside, and said, "Yes, come on in."

The agents entered the apartment and moved down a hallway. Agent Godwin entered Jlassi's bedroom and Agent Grubb stopped at a second bedroom occupied by defendant Abdenbi. Agent Mallard testified that he remained in the hallway so he "could see inside both bedrooms and into the living room."

At the suppression hearing, Agent Grubb testified that Abdenbi was in bed, although it was unclear if he was asleep. He further testified that the bedroom door was open; the lights in the bedroom were off and it was "mostly dark"; that he stood in the doorway, not in the bedroom; and the only exit from the bedroom was the door leading to the hallway. During his direct examination, Agent Grubb testified that he identified himself as a police officer and "told [Abdenbi] that he needed to come out and requested that he step out somewhere where I could talk to him." On cross-examination, Grubb clarified his testimony, stating that he "asked [Abdenbi] to get out of the bedroom." [2] Grubb further testified that he did not physically touch Abdenbi, did not draw his weapon, and did not raise his voice. Abdenbi did not refuse the agent's request, but asked if he could put on some clothes.

After Abdenbi put on a shirt and shorts, he accompanied Agent Grubb and Mr. Bejaoui into the living room. Grubb testified that he then "waited for Agents

---

[2]Consistent with Grubb's testimony on cross-examination, the district court found that Grubb "*asked* Mr. Abdenbi . . . to come from his bedroom out into the living room." Dist. Ct. Order (July 9, 2002) at 2 (emphasis added).

Godwin and Mallard in the back room, and I just basically sat there with Mr. Bejaoui and Mr. Ben Abdenbi awaiting the arrival of the other two agents because at that point my case was concerning Mr. Jlassi." Agent Godwin then entered the living room and began questioning Abdenbi. Godwin asked Abdenbi biographical questions and then questioned him regarding his right to be in the United States. Abdenbi admitted that he was in the United States illegally. Godwin placed him under arrest.

Agent Mallard's testimony regarding the encounter with Abdenbi in his apartment differed only slightly from Agent Grubb's. On cross-examination, Agent Mallard first testified that he entered Abdenbi's bedroom and that Abdenbi was awake. Mallard then stated, however, that he could not remember whether his initial contact with Abdenbi occurred in the bedroom or the living room although he did remember that Agent Godwin was in the room.

> Q. When you talked to [Abdenbi] about his immigration status, where was he?
> A. Mr. Godwin was in the room. I believe I was in the room at that point also because we were–he told us there was a passport; I remember that.
> Q. So you are not sure where you talked to him?
> A. To be honest, initially the very first time I spoke to him, I don't remember exactly which room it was.

Defense counsel asked Mallard to clarify his testimony and the following exchange took place:

> Q.     And that for officer safety Mr. Grubb asked Mr. Abdenbi to go to the living room. He went to the living room along with Mr. Bejaoui, and then subsequent to that Godwin and yourself came to the living room after talking to Mr. Jlassi and then talked to Mr. Abdenbi. Is that the sequence of events or not?
>
> A.     That sounds correct, yes.

At approximately 8:00 a.m., the agents left the apartment with Abdenbi and Jlassi and proceeded to the INS office. Abdenbi signed a written waiver of his *Miranda* rights and was questioned further. After additional investigation, Abdenbi was charged with one count of using a Social Security account number obtained with false information in violation of 42 U.S.C. § 408(a)(7)(A); one count of fraud and misuse of a government identity document in violation of 18 U.S.C. § 1546(a); and one count of possession of a false identification document in violation of 18 U.S.C. § 1028(a)(6).

Abdenbi filed a motion to suppress "any and all evidence seized as a result of [his] illegal seizure and interrogation." The district court denied the motion[3] and Abdenbi entered into a conditional plea agreement with the government, reserving the right to appeal the district court's ruling on his motion to suppress. This appeal followed.

---

[3]We admonish appellant's counsel for failure to adhere to 10th Cir. R. 28.2(A)(1) which requires that he attach to appellant's brief a copy of the district court's written order denying appellant's suppression motion.

## III. Discussion

### A. Standard of Review

This court reviews *de novo*, a district court's determination of reasonableness under the Fourth Amendment. *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003). In the course of that review, we consider the evidence in the light most favorable to the government and will not overturn factual findings unless they are clearly erroneous. *Id*. at 1257-58. The question of whether consent to a warrantless search was given voluntarily is one of fact to be determined from all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973). The burden of proving voluntariness is borne by the government. *Id*. at 248.

### B. Initial Entry Into the Apartment

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted). Abdenbi does not dispute that Bejaoui had authority to consent to the search of the apartment, but instead argues that Bejaoui's consent was not given voluntarily.

After examining the evidence presented at the hearing on the motion to suppress, the district court concluded that there was "no evidence of force, threat or coercion of any kind." On appeal, Abdenbi relies on "empirical data" set forth in several law review articles and an unpublished Ph.D. dissertation to support the broad proposition that almost all encounters with law enforcement officers carry an "air of menace" and implicit coercion. From this he argues that Bejaoui's consent was involuntary because no reasonable person ever feels free to decline an officer's request for permission to enter or search.

We cannot accept Abdenbi's broad proposition because it would have the practical effect of preventing all district courts in this circuit from ever finding that an individual's cooperation with law enforcement officials was voluntary. The correct approach remains that articulated by the Supreme Court in *Schneckloth* : "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 227.

Our review of the record convinces us the district court's finding that Bejaoui voluntarily consented to the search of the apartment is not clearly erroneous. Abdenbi lists the following factors as support for his assertion that Bejaoui's consent was not given voluntarily: (1) the request was made by three

armed officers; (2) the encounter occurred in the early morning hours in a nonpublic place; and (3) the officers used aggressive language or tone of voice. We first note that there is absolutely no record support for Abdenbi's assertion that the agents used threatening language or that Mr. Bejaoui knew they were armed. Further, it is axiomatic that all requests to search a home or apartment are made in nonpublic places.

The district court's ruling was based on a consideration of the totality of the circumstances. Those circumstances indicate that Mr. Bejaoui was contacted at his home, early in the morning, by three federal agents dressed in civilian clothes. The record clearly indicates there were no threats made by any of the officers and no display of weapons or force. The agents testified that they arrived early in the morning because they hoped to speak to Jlassi before he left for work. The presence of three officers is neither inherently coercive nor dispositive to the district court's inquiry. The record is void of any indication that Bejaoui was threatened or coerced in any way. Accordingly, we conclude that the district court did not clearly err in finding that Bejaoui voluntarily consented to the search of the apartment.

Although the dissent analyzes whether Bejaoui's consent was broad enough to permit the agents to search the entire apartment and whether Bejaoui had authority to permit the agents to search Abdenbi's bedroom, that analysis is

misplaced because those theories have never been argued in this case. There is no indication in the record that Abdenbi raised either argument in his suppression motion. The statements of Abdenbi's counsel cited by the dissent are insufficient to preserve the issues and are anything but a plain argument that the search exceeded the scope of Mr. Bejaoui's consent. Dissent at 9. Counsel, instead, was responding to a protective sweep argument made by the government. He then returned to his main point: that a reasonable person in Abdenbi's position would not have felt free to terminate the encounter. Counsel's illusory scope argument was obviously not plain to the district court either, since the court responded to counsel's statements as follows:

> Well, let me ask you this, because the ability to terminate an encounter is also integral to any of these decisions. So what does the Supreme Court ruling mean here?

The dissent does not indicate where in the record the authority issue was raised. The district court's order, therefore, predictably contains no discussion of either the scope or the authority issue. The dissent concedes as much when it acknowledges that, "[t]he district court, however, expressly concluded only that Mr. Bejaoui consented 'to the agents' entrance.'" Dissent at 5. The well-settled law of this circuit is that issues not raised in district court may not be raised for the first time on appeal. *O'Connor v. City & County of Denver*, 894 F.2d 1210, 1214 (10th Cir. 1990).

-10-

Further, the issues were not raised in Abdenbi's opening brief. Instead, his argument focused *solely* on whether Bejaoui's consent was given freely and voluntarily. The failure to raise an issue in an opening brief waives that issue. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994). Abdenbi does allude to the scope issue in his reply brief when he responds to an issue raised by the government in its brief. Abdenbi's argument is cursory, as evidenced by his citation to a single, marginally relevant case. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1202 n.4 (10th Cir. 2003) (concluding that even an issue raised before the district court is waived if it is not adequately developed on appeal). His reply brief contains absolutely no discussion of the dissent's main point: that Bejaoui lacked authority to consent to a search of the entire apartment. Even assuming, as the dissent believes, that the scope issue "was given significant attention at oral argument," our precedent holds that issues may not be raised for the first time at oral argument. *Durham v. Xerox Corp.*, 18 F.3d 836, 841 n.4 (10th Cir. 1994).

The dissent thus advocates reversal in this case based on two theories not properly raised or briefed by Abdenbi and relies on *Singelton v. Wulff*, 428 U.S. 106, 121 (1976) and *Sussman v. Patterson*, 108 F.3d 1206, 1210 (10th Cir. 1997) for the sweeping proposition that this court should exercise its discretion to reverse on the basis of issues not raised below when a case presents important

-11-

constitutional issues.  Dissent at 10.  Neither *Singleton* nor *Sussman*, however, provides any support for the dissent's approach.  In *Singleton*, the Court *reverse*d the judgment of the Court of Appeals, concluding that the appellate court's resolution of an issue not addressed by one of the parties because it had no opportunity to do so, was "an unacceptable exercise of its appellate jurisdiction." 428 U.S. at 119-21 ("[I]njustice was more likely to be caused than avoided by deciding the issue without petitioner's having had an opportunity to be heard.").  In *Sussman*, the issue addressed by this court had "been briefed fully by the parties and involve[d] a pure legal issue."  108 F.3d at 1210.  In the case at bar, the issue has *not* been fully briefed by the parties and its resolution involves questions of fact, *not* purely legal questions.  *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990) ("Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous").  This court should neither raise *sua sponte* an argument not advanced by a party either before the district court or on appeal, nor then advocate a particular position and resolve the appeal based on that advocacy.  Given Abdenbi's failure to properly raise, brief, and argue the scope and authority issues, the dissent's discussion and resolution of those issues is contrary to established precedent.  *Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th

Cir. 1992) ("[A] federal appellate court does not consider an issue not passed upon below." (quotation omitted)); *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("This court . . . will not craft a party's arguments for him.").

This case illustrates perfectly the soundness of that precedent. Because the scope and authority issues were not presented to the district court, that court made no factual findings necessary to resolve the issues raised *sua sponte* in the dissent. Notwithstanding the dissent's recognition that the scope of consent is a question of fact, it nevertheless reaches its conclusion by substituting for the trial court as a factfinder and assuming the facts in Abdenbi's favor. Dissent at 5 (citing *Pena*, 920 F.2d at 1514 for the proposition that the scope of consent involves questions of fact). Thereafter, the dissent consistently treats Abdenbi as a co-tenant and relies on cases dependant on co-tenancy status to resolve the authority issue. The record, however, never establishes Abdenbi's status in the apartment or addresses whether Bejaoui and Abdenbi had mutual use of the entire apartment. *United States v. Rith*, 164 F.3d 1323, 1329-30 (10th Cir. 1999) ("Mutual use of property by virtue of joint access is a *fact-intensive inquiry which requires findings by a court* that the third party entered the premises or room at will, without the consent of the subject of the search." (emphasis added)). Contrary to the dissent's interpretation of *Rith*, the case does not stand for the proposition that a co-tenant

-13-

relationship creates a rebuttable presumption that neither co-tenant has control over the property of the other. Dissent at 7-8 n.2. *Rith* held only that a co-tenant relationship does not create a presumption of control. Abdenbi's failure to raise the authority issue in the district court undercuts any criticism of the government's failure to introduce evidence of mutual use.

The record does suggest that Abdenbi was not a permanent co-tenant. Agent Grubb testified that Abdenbi "indicated he was staying there for a short period with Mr. Jlassi." Thus, a factual assumption that Abdenbi was a mere short-term guest is far more justified than the factual assumption made by the dissent. *Any* assumption, however, is inappropriate in a case like this where the parties developed the record only on the issues they raised. As a consequence, we do not make any such factual assumptions on the issues raised only by the dissent or speculate on whether the agents' actions exceeded the scope or authority of Bejaoui's consent. Instead, we adhere to our precedent and do not further address the *sua sponte* issues in the dissent.

C.      *Encounter in Abdenbi's Bedroom*

Abdenbi next argues that he was seized, in violation of the Fourth Amendment, when he was asked to move from his bedroom to the living room. The government asserts that the encounter was not an unconstitutional seizure because Abdenbi gave consent. *Florida v. Bostick*, 501 U.S. 429, 434 (1991)

-14-

("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." (citation and quotation omitted)).  We conduct a *de novo* review of all the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment.  *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc).  Relevant circumstances include,

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects . . .; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

*United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).  Another relevant circumstance is whether the officers advised the individual that he was not required to cooperate.  *Little*, 18 F.3d at 1505.  Because the inquiry involves an analysis of all the circumstances, no one factor is dispositive.  *Id*. at 1503-04.

Our review of the record has uncovered no support for Abdenbi's assertion that there was an "impressive display of police power taking place" in his bedroom when he was asked to move to the living room.  The district court found

that only Agent Grubb entered Abdenbi's bedroom, and that Agent Mallard and Agent Godwin were both in Jlassi's bedroom when Agent Grubb asked Abdenbi to move to the living room. [4] The court further found that Abdenbi then left his bedroom, accompanied by Grubb and Bejaoui, and sat in the living room. The record demonstrates that these findings are amply supported by the testimony of both Grubb and Mallard and are not clearly erroneous.

On direct examination, Grubb testified that he wanted Abdenbi to go to the living room so he could speak to him "while Agents Mallard and Godwin were speaking with Jlassi." On cross-examination, Grubb further testified that he did not enter Abdenbi's bedroom, but stood in the doorway. Agent Mallard stated on cross-examination that he stood in the hallway while Agent Godwin entered Jlassi's bedroom and Agent Grubb entered Abdenbi's bedroom. Mallard then testified about his questioning of Abdenbi. He stated that Agent Godwin was in "the room" when he began the questioning but he did not specifically identify "the room" as either the living room or the bedroom. When pressed by defense

---

[4]Although the dissent asserts that it could not locate this finding in the record, the district court's order states as follows:
> Once inside, Agents Mallard and Godwin went to Mr. Jlassi's bedroom, where they determined his illegal status. Special Agent Grubb went with Mr. Bejaoui to a second bedroom and asked Mr. Abdenbi, the third roommate and defendant in this case, to come from his bedroom out into the living room. Mr. Abdenbi dressed and went to the living room with Special Agent Grubb and Mr. Bejaoui.

Dist. Ct. Order (July 9, 2002) at 2.

counsel, Mallard admitted that he could not remember whether he first spoke to Abdenbi in the bedroom or the living room. However, Mallard then agreed that defense counsel correctly summarized the sequence of events when he stated, "[Abdenbi] went to the living room along with Mr. Bejaoui, and then subsequent to that Godwin and yourself came to the living room after talking to Mr. Jlassi and then talked to Mr. Abdenbi."

The agents' testimony undermines Abdenbi's sensationalized description of his bedroom as a scene of uncontrolled chaos. There is simply no record support for Abdenbi's assertion that shortly after Grubb entered his bedroom, Agents Mallard and Godwin "barge[d] into the room," blocking the only exit and demanding to see his passport. Instead, the record supports the district court's conclusion that Agent Grubb was the only law enforcement officer who contacted Abdenbi in his bedroom. Further uncontroverted evidence indicates that Agent Grubb identified himself as a police officer, did not display his weapon, did not raise his voice, did not physically touch Abdenbi, and was not retaining any of Abdenbi's possessions or documents. Abdenbi calmly got out of bed, put on some clothing, and accompanied Grubb to the living room.

It cannot be contested that the encounter between Agent Grubb and Abdenbi occurred very early in the morning, in a nonpublic place with no other individuals present. The record further indicates that Agent Grubb did not advise

Abdenbi that he was free to disregard the agent's request. Although Grubb appeared in the doorway of Abdenbi's room in the early morning hours while Abdenbi was still in bed, the encounter was calm and orderly with no show of force or physical touching. Having reviewed all the circumstances surrounding the encounter between Agent Grubb and Abdenbi, including the district court's specific factual findings combined with other uncontroverted evidence in the record, we conclude that a reasonable person in Abdenbi's position would have felt free to terminate the encounter with Agent Grubb. Thus, the encounter was consensual and it does not implicate the Fourth Amendment.

The dissent relies, in part, on its own findings of fact to reach the opposite conclusion. For example, there is simply no record support for the dissent's finding that Abdenbi was "accosted" by the agents. Dissent at 15. Abdenbi did not even testify at the suppression hearing; the only witnesses were agents Grubb and Mallard. Hence, the agents' descriptions of the encounter are uncontroverted and the dissent improperly embellishes those descriptions without even the benefit of Abdenbi's testimony.

The dissent's conclusion is also driven by its troubling determination that an individual's subjective state of mind informs the question of whether a reasonable person would feel free to terminate an encounter with the police. Dissent at 23. The subjective state of mind of either Grubb or Abdenbi is wholly

irrelevant and plays no role in our evaluation of the circumstances surrounding the encounter. *Little* , 18 F.3d at 1505 ("[T]he particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test."); *United States v. Zapata* , 997 F.2d 751, 757 (10th Cir. 1993) ("[The defendant's] own subjective attitudes toward the police encounter, or any other of his particular personal attitudes, are irrelevant . . . ."). The dissent's approach seeks to transform the objective standard into a subjective standard and must be firmly rejected. Further, in this case there is absolutely no basis for the dissent to assume that Abdenbi, who did not testify, is an objectively reasonable person such that his subjective state of mind is relevant to the objective analysis.

D. *Encounter in the Living Room*

Finally, Abdenbi argues that he was seized after he moved from his bedroom to the living room. Abdenbi, however, does not explain how the circumstances surrounding the encounter in the living room differ in any relevant way from the circumstances in his bedroom. Instead, his argument is based solely on Agent Grubb's subjective state of mind. Grubb testified that he, Bejaoui, and Abdenbi waited in the living room while Agent Mallard and Agent Godwin questioned Jlassi in Jlassi's bedroom. Grubb stood just to the right of the doorway to the living room; Abdenbi was seated in a chair and Bejaoui on a sofa.

Grubb further testified that while the three waited, he made small talk to keep the situation calm. Defense counsel then engaged Grubb in the following line of questioning:

> Q: [] You said that–the impression I get from your testimony is they were free to go about their business. Go about their business doing what?
> A: Well, at that point we had two agents in the residence back in that hallway, so I would not have let them mill around or approach that area again.
> Q: So they weren't free to go anywhere but sit on that couch?
> A: Well, it never came to that, sir, because they consensually sat there and they never indicated they wanted to go anywhere.

Abdenbi argues that Grubb's testimony constitutes a "candid admission" that the encounter in the living room constituted a seizure. Abdenbi's argument, however, is foreclosed by binding circuit precedent. The correct framework within which this court must view the encounter has been clearly set forth in our prior cases. "A person is seized only when that person has an *objective reason* to believe he or she is not free to end the conversation with the officer . . . ." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996) (emphasis added). Neither the personal traits of the individual nor the subjective intentions of the individual or the officer are relevant. *Sanchez*, 89 F.3d at 718; *Little*, 18 F.3d at 1505. Because Abdenbi's argument is based on the subjective intentions of Agent Grubb, we must reject it.

-20-

The record demonstrates that Abdenbi was not advised that he could leave the living room and the encounter took place in a nonpublic place. There were, however, other individuals present. The encounter was calm; the agents did not display their weapons, raise their voices, or speak in a commanding tone; and there was no physical contact between Abdenbi and any of the agents. Based on a consideration of all the relevant circumstances, we conclude that a reasonable person in Abdenbi's position would have felt free to terminate the encounter in the living room. Consequently, the encounter in the living room was consensual and not in violation of the Fourth Amendment.

The dissent repeats its theory that an individual's subjective state of mind informs the objective analysis of whether a reasonable person would feel free to end a police encounter. Dissent at 24-25. Again, we must firmly reject this attempt to allow subjective state of mind to drive the objective standard.

IV.    **Conclusion**

The judgment of the United States District Court for the District of Colorado denying Abdenbi's suppression motion is        **affirmed** .

No. 02-1435, *United States v. Ben Abdenbi*

**McConnell** , J., dissenting.

Before daybreak on April 10, 2002, Mr. Samir Hedi Ben Abdenbi, a citizen of Tunisia living (illegally, as we now know) in Denver, Colorado, was awakened in his bedroom by agents of the United States government. They did not have a warrant to enter or search the home. Nor did they have any reasonable suspicion of wrongdoing by Mr. Ben Abdenbi. In fact, they were not even aware of Mr. Ben Abdenbi's existence. At least one, and possibly more, agents (depending on which version of which agent's testimony is to be believed), wearing plain clothes and carrying concealed firearms, entered his bedroom, rousted Mr. Ben Abdenbi out of bed in his underwear, and told him or asked him (depending on which version of the agent's testimony is to be believed) to leave his bedroom and go to the living room. There he was instructed to sit and (according to the agent's own uncontradicted testimony) was not allowed to leave the room. He was questioned regarding his immigration status, which was unlawful; he was then arrested, charged, and ultimately convicted of fraud and misuse of a government identity document.

The majority concludes the "encounter" was "wholly consensual." Maj. Op. 2.

One of Mr. Ben Abdenbi's apartment mates, Mr. Amour Bejaoui, apparently awakened by knocks on the door, admitted the agents so that they

could speak to a third apartment mate, Mr. Janis Habib Jlassi. Once inside the door, the three armed agents proceeded, without seeking further permission, to comb the entire apartment, including the bedroom where Mr. Ben Abdenbi was sleeping, and to order all the inhabitants – not just Mr. Jlassi – into the living room for questioning. According to the majority, Mr. Bejaoui's admission of the agents into the apartment to speak to Mr. Jlassi constituted "consent" to search the entire apartment (Maj. Op. 9), Mr. Ben Abdenbi's compliance with instructions to come to the living room was a product of his own consent (*id*. at 18), and the agent's admission that the men were not free to leave the living room reflected only the agent's "subjective intentions" and not the objective reality of a Fourth Amendment seizure (*id*. at 20). I respectfully dissent as to each element of the analysis.

1. Mr. Bejaoui's Consent.

I do not believe Mr. Bejaoui's act of admitting the three agents into the apartment to speak to Mr. Jlassi can reasonably be construed as consent for them to sweep through the apartment, enter all the bedrooms, and order every member of the household out of bed for questioning.

In *Florida v. Jimeno*, 500 U.S. 248 (1991), the Supreme Court held that when determining the scope of consent, courts should employ a standard of objective reasonableness, asking how a reasonable person would have understood

the exchange between the officer and the suspect. *Id.* at 250-51. The Court held that "[t]he scope of a search is generally defined by its expressed object." *Id*. at 251. In that case, because the officer told the defendants that he would be looking for narcotics in the car, it was objectively reasonable for the officer to interpret consent as authorizing the search of a closed paper bag within the car. *Id.* at 251-52.

Although in general we have employed fairly expansive interpretations of officers' search requests, *see, e.g.*, *United States v. Gigley*, 213 F.3d 509, 513, 515 (10th Cir. 2000) (consent to "look in" automobile included authorization to look under rear seat of van); *United States v. McRae*, 81 F.3d 1528, 1537-38 (10th Cir. 1996) (officer's request to search the trunk of a car permitted lifting carpeting in trunk), we have insisted that the words the officer uses in requesting consent limit the permissible scope of the search. *See, e.g.*, *United States. v. Elliott*, 107 F.3d 810, 814-15 (10th Cir. 1997) (officer's request to look in trunk to see how items were "packaged" did not include authorization to open and inspect packages) (citing 3 Wayne R. LaFave, *Search and Seizure* § 8.1(c) at 620 (3d ed. 1996) ("When a purpose is included in the [officer's] request, then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose.")); *United States v. Leary*, 846 F.2d 592, 599 (10th Cir. 1988) (assuming that consent to examine corporate records

related to export activities was given, this consent did not authorize examination of financial records unrelated to export activities); *United States v. Towns*, 913 F.2d 434, 442 (7th Cir. 1990) (defendant's allowing police to enter apartment to provide identification did not authorize police to search through his belongings and conduct an exploratory search of apartment for a seven-hour period).

On direct testimony, Agent Kenneth Grubb's entire description of his request for Mr. Bejaoui's consent consisted of the following: "we requested entry to the apartment so we could speak with Mr. Jlassi." Suppression Hr'g Tr. 11, R. vol. 2 (hereinafter cited as "Tr."). On cross-examination, Agent Grubb elaborated. After the agents asked Mr. Bejaoui whether Mr. Jlassi lived there and received an affirmative answer, the following conversation ensued between Agent Grubb and Mr. Bejaoui:

> Q.  What did you say?
>
> A.  I said, "Well, we need to talk to him. Can we come in?"
>
> Q.  And what did he say?
>
> A.  He allowed us to enter at that point.
>
> Q.  What did he say?
>
> A.  I don't recall specifically, but he opened the door.
>
> Q.  Did he stand aside?
>
> A.  No.  He opened the door farther, and yeah, I guess he did step aside. I can't recall whether he led the agents in or just fell in behind.

-4-

Tr. 33.

As this testimony indicates, Agent Grubb explicitly requested only to "come in" to the apartment and to "speak with Mr. Jlassi." A reasonable person would not interpret this exchange as consent to search the entire apartment or to roust the entire household out of bed. A reasonable person in Mr. Bejaoui's shoes (or bare feet, as the case may be) would interpret this exchange to mean that the agents would enter the apartment and wait in the entranceway or common areas of the apartment while Mr. Jlassi was summoned by Mr. Bejaoui – or at the most intrusive, be escorted to Mr. Jlassi's room.

Once inside the door, the agents made no further request for permission to penetrate into the private areas of the apartment. According to Agent Grubb's testimony: "I believe Ross [Agent Godwin] asked him where Mr. Jlassi was, and I don't know that he received a response, but we walked through the back two bedrooms." Tr. 12.

The district court is entitled to broad deference in determining the scope of consent. *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990) ("Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous."). The district court, however, expressly concluded only that Mr. Bejaoui consented "to the agents' entrance,"

-5-

Dist. Ct. Op. 4-5, R. doc. 24 (hereinafter cited as "Dist. Ct. Op."), which I do not dispute. The question is how they got permission to roam about the apartment, poking their heads into the bedrooms of sleeping (or resting) occupants. *See* 3 Wayne R. LaFave, *Search and Seizure* § 8.1(c) at 622 (3d ed. 1996) (consent to enter a residence to conduct questioning does not permit a search).

Moreover, even assuming that Mr. Bejaoui's admission of the agents into the apartment could reasonably have been interpreted as consent to search the entire apartment, I cannot agree that he had authority to permit the agents to search the bedrooms of his apartment mates. It is one thing to hold – as the district court did (Dist. Ct. Op. 4-5) – that Mr. Bejaoui had authority to consent to the entry, or even that he had authority to invite the agents into the common areas of the apartment. It is quite another to hold that one resident of a multi-tenant apartment can consent to a search of another resident's bedroom. [1]

In *United States v. Matlock*, 415 U.S. 164, 170-73 (1974), the Supreme Court recognized that co-tenants with common authority over the premises may authorize police searches of the residence, and that third-party consent may be valid against the nonconsenting party who is the ultimate subject of the search.

---

[1] The majority speculates that Mr. Ben Abdenbi may not have been a "permanent co-tenant," based on an agent's hearsay testimony that Mr. Ben Abdenbi had said he was "staying there for a short period with Mr. Jlassi." Maj. Op. 13. The district court, however, described the men as "roommates" and accepted the agents' inference that they "resided together." Dist. Ct. Op. 9.

However, neither the Supreme Court nor this Court has ever held that co-tenants have plenary authority over their roommates' private quarters. Indeed, *United States v. Rith*, 164 F.3d 1323 (10th Cir. 1999), states a presumption to the contrary. The issue in *Rith* was whether parents had authority to grant police access to search the room of their teenage son. *Id*. at 1327-28. The Court held that because parents were presumed to have authority over the entire house, their consent was binding on their offspring. However, in the course of this discussion, *Rith* contrasted the parent-child relationship with the arrangement typically found among roommates, finding that:

> Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships. In contrast, a simple co-tenant relationship does not create a presumption of control and actual access would have to be shown. *See United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) ("Two friends inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to their respective bedrooms without explicitly making this expectation clear to one another."); *United States v. Heisman*, 503 F.2d 1284, 1287 (8th Cir. 1974) (although defendant's room did not have a door or a lock, co-tenant did not have authority to consent to a search of defendant's private areas).

*Id*. at 1330 (some citations omitted). [2]

---

[2] In addition to validating third-party consent when the co-tenant has "control for most purposes" over the property, *Rith* raises the possibility of valid consent when the co-tenant has "mutual use of the property by virtue of joint access." 164 F.3d at 1329. *Rith,* however, finds this second test to be a "fact-

(continued...)

Albeit in *dicta*, but relying on holdings from other circuits, this Court in *Rith* recognized a presumption that one roommate cannot grant consent for police to search the bedroom or private quarters of his co-tenant. *Id.* Even assuming that Mr. Bejaoui gave the agents authority to do more than come inside the apartment, nothing in the record supports a finding that Mr. Bejaoui was authorized to grant access to Mr. Ben Abdenbi's room. Quite the contrary, because the apartment was inhabited by several roommates, the presumption is that Mr. Bejaoui's consent was *not* a valid waiver of the privacy interest maintained by Mr. Ben Abdenbi in his bedroom. *See id.*

If Mr. Bejaoui did not consent to the search of the private areas of the apartment, or if he lacked authority to consent to the search of his apartment

---

[2](...continued)
intensive inquiry" which requires findings by a court that the third party may enter the premises at will and without the consent of the subject of the search. *Id.* at 1329-30. The majority silently flips the burden of proof on this issue, and seems to suggest that an individual living in a multi-occupant apartment is presumed not to be a co-tenant unless he proves otherwise. Maj. Op. 12. *Rith* stands for the opposite presumption. *See id.* at 1330 (contrasting the presumptive differences between familial and co-tenant living arrangements noting "[t]he difference between a husband-wife or parent-child relationship and a co-tenant relationship is that a husband-wife or parent-child relationship raises a presumption about the parties' reasonable expectations of privacy in relation to each other *in spaces typically perceived as private in the co-tenant relationship.*") (emphasis added). Because there is no evidence in the record suggesting that Mr Bejaoui had permission to enter Mr. Ben Abdenbi's room at will, I rely on the presumption that roommates maintain exclusive privacy interests in their bedrooms. *See id.*

mate's bedroom, then the encounter between Mr. Ben Abdenbi and the agents should not have taken place. Accordingly, the evidence of Mr. Ben Abdenbi's statements to the agents should have been suppressed.

For the most part, the majority does not defend this aspect of the search on the merits. I hope this will signal to law enforcement officers and lower courts that, despite our affirmance of Mr. Ben Abdenbi's conviction, this circuit does not condone the brazen tactics used by the officers to gain entry to his bedroom. The majority maintains that this Court should not reach the merits because the issues regarding the scope of Mr. Bejaoui's consent "have never been argued in this case." Maj. Op. 10. I beg to differ. In district court, Mr. Ben Abdenbi's counsel argued:

> Yeah, it's 6 o'clock in the morning. The police officers knock on the door and they request permission and they acquiesce to the entry. . . . It's police officers with badges saying they want to come in, not "We want to come in and search," not "we want to come in and do a protective sweep," not "we want to come in and gather everybody into the living room;" simply "We want to come in."
> Mr. Bejaoui opens the door and they come in, and then it is like once the door is opened, the flood gates are open and we have this protective sweep going on . . .

Tr. 90. Counsel may not have uttered the word "scope" but counsel was plainly arguing that consent to entry does not constitute consent to search the entire apartment and to question everyone it in. Moreover, issues relating to Mr. Bejaoui's scope of consent were raised by the parties in this Court. In its brief to

this Court, the government relied on    and cited *United States v. Matlock*, 415 U.S. 164 (1974), and *Illinois v. Rodriguez*, 497 U.S. 177 (1990), for the proposition that co-tenants can grant consent against one another. Gov. Br. 8. Responding to the government's arguments, Mr. Ben Abdenbi argued that the agents "exceeded the scope of Mr. Bejaoui's consent" when they entered Mr. Ben Abdenbi's "bedroom and directed him to step into the living room for questioning." Rep. Br. 2. Finally, this issue was given significant attention at oral argument.

I therefore believe the issue is before us. In any event, even if counsel could have raised the issue more emphatically, the constitutional principle involved is important enough that we should exercise our discretion to address it. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals."); *Sussman v. Patterson*, 108 F.3d 1206, 1210 (10th Cir. 1997) (court of appeals may use its discretion to reverse on the basis of issue not raised below particularly when it is a questions of law that raises important public policy concerns or when ignoring the claim would result in a miscarriage of justice).

2. <u>Mr. Ben Abdenbi's "Consent"</u>

That brings us to the second stage in this remarkable consensual search: the encounter between Mr. Ben Abdenbi and the agents in his bedroom, as Mr. Ben

-10-

Abdenbi was lying in bed. Relying on *Florida v. Bostick*, 501 U.S. 429 (1991), and our opinion in *United State v. Little,* 18 F.3d 1499 (10th Cir. 1994) (en banc), the majority finds that Mr. Ben Abdenbi was not "seized" because a reasonable person in Mr. Ben Abdenbi's position would have felt free to terminate the encounter. Maj. Op. 18. In light of the circumstances under which police encountered Mr. Ben Abdenbi, I find that conclusion most unrealistic.

It bears mention at the outset that the district court did not make a specific factual finding that Mr. Ben Abdenbi consented to leave his bedroom with the agent. After addressing the agent's initial entrance into the apartment, the district court focused mainly on the subsequent questioning in the living room, rather than concentrate on whether Mr. Ben Abdenbi voluntarily consented to leave his

bed and accompany the agents to the living room.[3]  Thus, there is no explicit

factual finding to which we might have to defer.

*Bostick* and *Little* trace their lineage to the Supreme Court's holding in

*Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry* held that not all encounters between

citizens and police are considered "seizures" within the meaning of the Fourth

Amendment.  *Id.* at 19 n.16.  Rather, the relevant factors are whether by means of

physical force or show of authority the officer restrained the liberty of the

suspect.  *Id.*  In *Florida v. Royer,* 460 U.S. 491, 497 (1983) (plurality opinion) the

Supreme Court reaffirmed this understanding, stating "law enforcement officers

do not violate the Fourth Amendment by merely approaching an individual on the

---

[3]The relevant passage of the district court's opinion reads as follows:
> Here, the three agents dressed in street clothing.  They entered the premises with Mr. Bejaoui's permission.  They did not show or brandish their weapons.  No evidence suggests that any agent became physical or used an aggressive tone of voice.  The officers did not retain the roommates' possessions.  *The questioning occurred in a common area with the three agents and the three roommates.*  And, though the encounter occurred in Mr. Abdenbi's residence, the agents were in the premises with Mr. Bejaoui's consent and Mr. Abdenbi voiced no objection.  Accordingly, I find and conclude that a reasonable person would have felt free to terminate the encounter with the agents.  Hence, the agents did not detain Mr. Abdenbi *at the time of Mr. Abdenbi's initial confession in the apartment.*

Dist. Ct. Op. 6 (emphasis added).  The italicized portions make clear that the district court was discussing whether the questioning of  Mr. Ben Abdenbi *in the living room* was consensual – not whether his decision to get out of bed and accompany the agents to the living room was consensual.

street or in another public place, [or] by asking him if he is willing to answer some questions."

Of course, Mr. Ben Abdenbi's bedroom was not a public place. To be sure, the Supreme Court has interpreted *Royer*'s "public place" language to extend to some locations that are not accessible to members of the public at large; but if the concept of "public place" extends to a bedroom, it is no limitation at all. In *INS v. Delgado*, 466 U.S. 210 (1984), the Court upheld the constitutionality of questioning by officers stationed at all exits of a factory even though it was not a "public" space in the sense that members of the general public could freely gain access to it. *Id.* at 217 n.5. But a factory, even if not open to the general public, falls within the principle of *Terry* and *Royer* because it is a place where many people come and go, without much sense of privacy.

*Bostick* extended *Royer* and *Delgado* a step further: to an intercity bus where officers questioned passengers about drug transportation. 501 U.S. at 435-37. The Court held that there was no *per se* rule holding that persons confronted by police on a bus were seized, even though the police presence on the bus significantly restricted their movement. *Id.*; *see Little*, 18 F.3d at 1503. Like the factory in *Delgado*, a public bus is a place in which strangers interact without much expectation of privacy. *Bostick* teaches that the proper analysis requires an examination of the totality of the circumstances to determine whether a

"reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" – not whether the defendant could have physically walked away from the police. *Id.* at 436.

Following *Bostick*, this Court, sitting en banc, applied these principles to the case of an officer who questioned a passenger seated in a semi-private roomette of a train. *Little*, 18 F.3d at 1501. Like *Bostick*, *Little* refused to find the physical layout of the space in which the officer questioned the defendant to be the sole determinant of the search's constitutionality. Rather, *Little* examined whether the encounter was consensual in light of the totality of the circumstances. *Id*. at 1506.[4]

In analyzing the consensual nature of the encounter in this case, the majority recounts that the agents did not raise their voices, display their weapons, or physically touch Mr. Ben Abdenbi. The opinion further emphasizes Mr. Ben Abdenbi's acquiescence to police requests and the relative calm in the apartment on the morning of the encounter. These are legitimate points to consider. But the element of surprise, the show of authority, the absence of any explanation, the

---

[4]Notably, neither *Bostick* nor *Little* held that the search at issue was constitutional; each case was remanded for further fact-finding. These cases simply rejected a rule that physical constriction caused by the environment rather than the police automatically transformed otherwise consensual encounters into "seizures." *See Bostick*, 501 U.S. at 437; *Little*, 18 F.3d at 1506. *But see Little*, 18 F.3d at 1508-09 (Logan, J., dissenting) (noting that lower courts have read *Bostick* as an affirmative holding that the defendant was not seized).

-14-

words used by the agents, the time of day, and the non-public setting make the encounter seem far more threatening and coercive than the majority is willing to recognize. Mr. Ben Abdenbi was in a particularly vulnerable state, as he lay in his bed in his underwear, confronting the unexplained presence of law enforcement in his room.

I begin with the last point: location. The most salient distinction between the present case and the line stretching from *Terry* to *Little* is that this encounter did not occur on a plane, train, or automobile, but rather in Mr. Ben Abdenbi's house – or more accurately, in his bedroom. Unlike the defendants in any of the cases in the *Terry* line, Mr. Ben Abdenbi was accosted[5] by police in the far recesses of his "zone of privacy." *Payton v. New York*, 445 U.S. 573, 589 (1980). There was no other location to which he could retreat (and remember, at this point, there was not the slightest basis for suspicion that Mr. Ben Abdenbi had engaged in any wrongdoing). Tr. 42-43.

---

[5]The majority suggests that I rely on my "own findings of fact" in questioning whether Mr. Ben Abdenbi consented to his seizure, Maj. Op. 17, but the majority's only example of "fact-finding" is my use of the verb, "accost," to describe the police officers' action in entering Mr. Ben Abdenbi's bedroom and rousting him out of bed. I think it is an eminently fair use of the term. *See Webster's Third New International Dictionary* 12 (1976) (defining "accost" as "1: to approach and speak to," and offering as an example the sentence "they were accosted by the immigration officials").

The Supreme Court has stressed the special character of the home for purposes of interpreting Fourth Amendment protections:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home – a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 [1961]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.

*Payton*, 445 U.S. at 589-90; *see also United States v. Flowers*, 336 F.3d 1222, 1226 (10th Cir. 2003) (quoting this language from *Payton*). While these cases addressed Fourth Amendment protections against unwarranted entry into the home (which we are assuming, arguendo, were waived by Mr. Bejaoui's consent), their reasoning is relevant to evaluating the totality of the circumstances under *Bostick*. *See United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (reversing a district court's denial of a suppression motion because it "failed to consider adequately two factors: the place and the time of the encounter"). Applying the *Bostick* standard under somewhat similar circumstances, the Seventh Circuit explained:

> Because our law and legal traditions long have recognized the special vulnerability of those awakened at night by a police intrusion at their dwelling place, our Fourth Amendment

> jurisprudence counsels that, when a knock at the door comes at the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution.

*Id.* In the past, this Court has refused to find consent where the consent was the product of a confused reaction of a sleeping person to a warrantless intrusion into his bedroom in the dark of night. *Harless v. Turner*, 456 F.2d 1337, 1338-39 (10th Cir. 1972).

The majority relies on our holding in *Little*. The en banc opinion in *Little*, however, contrasted the degree of privacy afforded to an occupant of a train roomette with the privacy expectations legitimately held within the home. *See Little*, 18 F.3d at 1504 (citing *United States v. Colyer*, 878 F.2d 469, 475-76 (D.C. Cir. 1989) (in the context of a luggage search, rejecting defendant's argument that an Amtrak roomette is like a hotel room or apartment, finding that "[w]hile an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in the law"); *United States v. Tartaglia*, 864 F.2d 837, 841 (D.C. Cir. 1989) (in the context of a warrantless search, noting that "a passenger traveling in a train roomette has a lesser expectation of privacy than a person in his home"); *United States v. Whitehead*, 849 F.2d 849, 853 (4th Cir. 1988) ("[W]e reject the contention that a passenger train sleeping compartment is a 'temporary home' for fourth amendment purposes . . . . [The amount of privacy one can reasonably

expect in a train] is less than the reasonable expectations that individuals rightfully possess in their homes or their hotel rooms.")).

I recognize that in *Little* we distinguished between the heightened expectation of privacy that one maintains in a particular location, which is relevant to determining the constitutionality of a search of that location, and the question whether a reasonable citizen believes that he can voluntarily terminate the encounter with police, which is the dispositive inquiry in assessing the constitutionality of questioning premised on the subject's consent. *Little*, 18 F.3d at 1505. Because the Fourth Amendment "seizure" inquiry is dependent on the consensual nature of the interaction, *Little* held that the expectation of privacy in the location of the police-citizen encounter is of "limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate the encounter." *Id*.

However, because this case is substantially different from the line of precedents stemming from *Terry* and *Royer*, under the facts before us, I find the location of the encounter significant. While the bus, the train, and the factory are undeniably more secluded than a street corner, they are nevertheless social spaces where citizens routinely encounter strangers. Even within a semi-private train roomette, a passenger will likely confront the ticket collector, the snack vendor, and perhaps other passengers milling about the train. Aware of this environment,

the passenger conforms his behavior to the expectations prevailing within the public sphere. By contrast, when one retires to one's own bed for the night, one's guard is naturally let down. Any confrontation with the outside world will occur only after one's morning routine is completed and the security of the home is abandoned. The "unambiguous physical dimensions of an individual's home," *Payton*, 445 U.S. at 589, provide the relevant point of transition from the uninhibited private mode to the guarded public one. Indeed, the special status of the home is reflected in the very language of the Fourth Amendment, which guarantees the right of the people to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Viewed from this perspective, the location of the agent's encounter with Mr. Ben Abdenbi is an important part of the totality of the evidence.

In addition to the setting, other factors support the conclusion that a reasonable person in Mr. Ben Abdenbi's situation would not have felt at liberty to ignore the police. The relevant facts are as follows: Agents entered Mr. Ben Abdenbi's room in the pre-dawn hours. There they found him mostly undressed and in his bed, with the lights off. It is undisputed that at least one, and possibly more, agents entered the room and requested that Mr. Ben Abdenbi come into the

living room for questioning.[6]  This activity was taking place as Mr.

---

[6]The majority finds that "the record supports the district court's conclusion that Agent Grubb was the only law enforcement officer who contacted Abdenbi in his bedroom," and criticizes Appellant for his "sensationalized description" of a situation involving entry and questioning by three officers.  Maj. Op. 17.  I suppose it depends on which versions of which agent's testimony one chooses to believe.  The testimony is admittedly confusing.  At one point, Agent Grubb testified that he was by himself with Mr. Ben Abdenbi and Mr. Bejaoui at the time Mr. Ben Abdenbi agreed to come to the living room. Tr. 15.  Agent Jayson Mallard, however, testified as follows:

Q.  And you never entered the bedroom, either bedroom?
A.  Yes, I did.  Initially, no, I did not.  I remained in the hallway so that I could see both the living room and the bedrooms.
Q.  Mr. Godwin entered Mr. Jlassi's bedroom?
A.  I believe so, yes.
Q.  And Mr. Grubb entered Mr. Abdenbi's bedroom?
A.  I believe so, yes.
Q.  Was Mr. Abdenbi sleeping?
A.  I am not aware if he was asleep at the time we walked in because we spoke to him, so he was awake by the time I was in the room.
Q.  Was he still in the room when you entered the room, he being Abdenbi, the defendant?
A.  Yes.

Tr. 72.  This clearly indicates that Agent Mallard remembered that he was present with Agent Grubb when Agent Grubb spoke to Mr. Ben Abdenbi.  Later, as the majority notes, Agent Mallard changed his testimony; he could not remember what room he was in when he spoke to Mr. Ben Abdenbi.  Tr. 73.

Appellant cites to another page in the transcript, Tr. 63, where Agent Mallard states that Agent Godwin was in Mr. Ben Abdenbi's bedroom, which he understandably interprets as meaning that all three agents were present. Appellant's Br. 18.  It seems more likely that this reference was a slip of the tongue, since it appears that Agent Godwin was involved with Mr. Jlassi in a different room (Tr. 14, 17, 73-74), and it is unlikely that they left Mr. Jlassi by himself.  Nonetheless, I cannot join the majority's pejorative description of Appellant's interpretation as "sensationalized," since it is a fair (though I think

(continued...)

-20-

Jlassi, Mr. Ben Abdenbi's roommate, was arrested and escorted to the living room. Nothing in the record indicates that Mr. Ben Abendbi was aware, or informed by the agents, that their presence in his bedroom was based on Mr. Bejaoui's consent. *Cf. Rith*, 164 F.3d at 1327 (teenaged defendant informed by police that his parents had given police consent to search the house). Further, police did not inform him in any manner that he was not required to cooperate with them or answer their demands. *Cf. Bostick*, 501 U.S. at 432 (police specifically informed defendant that he could refuse consent); *Little*, 18 F.3d at 1502 (officer informed defendant that she could refuse his request to search her hand luggage). Under the totality of these circumstances, the pre-dawn invasion of one's bedroom by uninvited government agents conveys an undeniable sense of

---

[6](...continued)

inaccurate) reading of the record, on a point on which there was no district court finding of fact.

The majority states that "the district court found that only Agent Grubb entered Abdenbi's bedroom" (Maj. Op. 16), but I cannot locate such a finding in the district court's opinion. Nonetheless, because an appellate court must consider the evidence adduced at the suppression hearing in the light most favorable to the government, *United States v. Rios*, 611 F.2d 1335, 1344 (10th Cir. 1979), I accept the conclusion that only one agent was present in Mr. Ben Abdenbi's bedroom.

Ultimately, I do not think the number of agents present in Mr. Ben Abdenbi's bedroom is dispositive, though it is one factor under *Little*. Even if there was only one agent, the totality of the circumstances does not support a finding of voluntary consent. Notably, the district court made no finding that Mr. Ben Abdenbi voluntarily consented to leave his bedroom with the agents. The district court found only that, once he was in the living room, Mr. Ben Abdenbi voluntarily consented to questioning. See note 3 above.

-21-

urgency, immediacy, and authority. I cannot understand the majority's assertion that a reasonable person would have felt that he could ignore the agents' request.

Indeed, it is not clear from the record that the agents even employed the vocabulary – let alone the reality – of consent. On direct testimony, Agent Grubb stated that he addressed Mr. Ben Abdenbi while he was still in bed, as follows: "I identified myself as the police and *told him that he needed to come out* and requested that he step out somewhere where I could talk to him." Tr. 14 (emphasis added). For a law enforcement officer who has suddenly appeared at one's bedside with no explanation to tell the occupant that "he needed to come out" is not my idea of requesting consent. It sounds more like an order. To be sure, when pressed on cross-examination, Agent Grubb revised his testimony to state, "I requested that he exit the bedroom." *Id*. at 36. The most charitable interpretation is that not even the agent involved was quite sure whether he was making a request or a demand. When asked whether Mr. Ben Abdenbi had been given any choice, Agent Grubb answered: "I don't know that he didn't have a choice." *Id.* at 37. That is not exactly a ringing affirmation.

Nor did Mr. Ben Abdenbi say anything in response which could be construed as consent. He simply complied with the agent's instructions. Thus, the words exchanged between the agent and the awakened man do little to dispel the otherwise coercive atmosphere of this encounter.

-22-

It is clear from the undisputed facts that Mr. Ben Abdenbi did not consider himself at liberty during this encounter. According to Agent Grubb's testimony, the half-naked man asked Agent Grubb *for permission* to put on some clothes before leaving his bedroom. An individual who considers himself free to disregard police instructions would not find it necessary to ask permission to put his clothes on. It is revealing, as well, that Agent Grubb did not respond by telling Mr. Ben Abdendi that he did not need his permission; instead, he gave it. To be sure, this is evidence only of Mr. Ben Abdendi's subjective understanding of the situation, and possibly that of Agent Grubb as well; but as part of the totality of the circumstances, the exchange is telling. The ultimate legal question is whether the individual had an "objective reason to believe he or she [was] not free to end the conversation with the officer," *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996), but surely the assessments of the officer and the individual, on the scene, are a part of the evidence. Mr. Ben Abdenbi and Agent Grubb were, after all, there; they are presumably reasonable; their contemporaneous evaluation of the totality of the circumstances is worthy of our consideration.

The government argues that "such a modest request" to leave his bedroom and accompany the agents to the living room was so "minimal" an "infringement on individual liberty" as to be akin to "an officer asking a person to move to a

safe place to talk on the street." Appellee's Br. 18. I doubt many ordinary people would share the government's equanimity about such an encounter.

3. Questioning in the Living Room.

Mr. Ben Abdenbi and Mr. Bejaoui were escorted to the living room. At the agents' request, they sat on a couch and a chair, while Agent Grubb stood by the exit door. According to Agent Grubb, the police would not have permitted the men to "mill around" the apartment or to approach the bedroom area. Tr. 40. This was a clear admission that Mr. Ben Abdenbi and Mr. Bejaoui had been seized, within the meaning of the Fourth Amendment. They were not free to terminate the encounter and go about their business.[7] This was their apartment; to be confined to their living room and not allowed to "mill around" or return to their bedrooms is a restriction on their freedom. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) (person who is not allowed to leave his home while police

_____

[7]To be sure, after making this statement, Agent Grubb immediately qualified his testimony:

Q.    So they weren't free to go anywhere but sit on that couch?

A:    Well, it never came to that, sir, because they consensually sat there and they never indicated they wanted to go anywhere.

Tr. 40. This statement, however, is nothing more than Agent Grubb's subjective impression of Mr. Ben Abdenbi's and Mr. Bejaoui's subjective state of mind. That the men were docile might indicate consent; it could just as easily indicate they were scared, or thought they had no choice in the matter.

-24-

are conducting a search is "seized" for Fourth Amendment purposes); *see also United States v. Bennett*, 329 F.3d 769, 773 (10th Cir. 2003) (same).

The district court explicitly found that "a reasonable person would have felt free to terminate the encounter with the agents" at this point. Dist. Ct. Op. 6. The district court made no mention, however, of Agent Grubb's undisputed testimony that the two men were not free to "mill around" or to approach the bedroom area. In light of this undisputed evidence, the conclusion that the men were not seized is clearly erroneous.

The majority does acknowledge Agent Grubb's testimony. Maj. Op. 20. But the majority disregards it on the ground that the evidence revealed only "the subjective intentions of Agent Grubb," which does not establish any objective reason that a person in Mr. Ben Abdenbi's situation would not feel free to go. *Id.* I think the evidence is more than that. Agent Grubb was not testifying about his subjective intentions; he was testifying about whether Mr. Ben Abdenbi and Mr. Bejaoui were free to move about the apartment. He said they were not. He was in an excellent position to know, since he was the one with the badge and the gun, standing next to the exit door. It defies common sense and ordinary experience to hold that no seizure has taken place when the police officer admits that the individuals were denied the right to "mill about" their own home.

4. Reasonable Suspicion

Finally, the district court held that the questioning of Mr. Ben Abdenbi in the living room was supported by reasonable and articulable suspicion, based on the following:

> The agents knew of Mr. Jlassi's fraudulent I-20 ID and letter. They knew of Mr. Jlassi's fraudulently obtained social security card. Upon lawful entry, the agents noticed that Mr. Abdenbi had few clothes but was apparently sleeping there. According to their experience and training, the agents knew that illegal aliens often resided together, sharing access to false documentation. Finally, the three roommates appeared to the agents to be foreigners and have Arab or Middle Eastern accents.

Dist. Ct. Op. 9.

The majority does not reach the issue of reasonable suspicion, because it concludes the encounter was "wholly consensual." I do not need to reach the issue because the large part of the information on which the district court relied (other than that pertaining to Mr. Jlassi) was obtained as a result of what I have concluded to be an unconstitutional and unconsented-to search of the private areas of the apartment. It is undisputed that, when they arrived at the apartment on the morning of April 10, 2002, the agents knew nothing of Mr. Ben Abdenbi. Tr. 42-43. Had they conducted their investigation within the terms of Mr. Bejaoui's consent, they would never have encountered Mr. Ben Abdenbi, and

-26-

would never have learned about how few clothes he had, where he was sleeping, his foreign appearance, or his Arab or Middle Eastern accent.

For the foregoing reasons, I respectfully dissent.